ROB BONTA
Attorney General of California
LAURA J. ZUCKERMAN (SBN 161896)
Supervising Deputy Attorney General
TARA MUELLER (SBN 161536)
JENNIFER LODA (SBN 284889)
HEATHER M. LEWIS (SBN 291933)
SUSANA AGUILERA (SBN 341788)
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-0754
Fax: (510) 622-2270
E-mail: Tara.Mueller@doj.ca.gov

*Attorneys for Plaintiff State of California*

NICK BROWN
Attorney General of Washington
MAGGIE BAKER SMITH (*pro hac vice*)
ELIZABETH M. HARRIS (*pro hac vice*)
Assistant Attorneys General
Washington Attorney General's Office
Environmental Protection Division
800 5th Ave., Suite 2000, TB-14
Seattle, WA 98104-3188
Telephone: (360) 582-6569
E-mail: Maggie.Smith@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

*(Additional counsel listed on signature page)*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA; STATE OF WASHINGTON; COMMONWEALTH OF MASSACHUSETTS, STATE OF MARYLAND; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WISCONSIN; DISTRICT OF COLUMBIA,

Plaintiffs,

v.

DOUG BURGUM, U.S. Secretary of the Interior; KEVIN LILLY, Principal Deputy Assistant Secretary for Fish and Wildlife and Parks; UNITED STATES FISH AND WILDLIFE SERVICE; BRIAN NESVIK, Director of the U.S. Fish and Wildlife Service; HOWARD LUTNICK, U.S. Secretary of Commerce, TIMOTHY R. PETTY, Assistant Secretary of Commerce for Oceans and Atmosphere and Deputy NOAA Administrator; ~~and~~ NATIONAL MARINE FISHERIES SERVICE; and EUGENIO PIÑEIRO SOLER, Director of the National Marine Fisheries Service,

Case No. 3:26-cv-10071-VC

**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF**

**(Administrative Procedure Act, 5 U.S.C. §§ 551-706)**

Defendants.

## INTRODUCTION

1. State Plaintiffs[1] bring this action to challenge the final decision by the Secretary of the Interior, acting through the United States Fish & Wildlife Service ("FWS"), and the Secretary of Commerce, acting through the National Marine Fisheries Service ("NMFS") (collectively, "the Services"), to promulgate an unlawful final rule eliminating well-established federal Endangered Species Act, 16 U.S.C. §§ 1531–44 ("ESA") protections for imperiled species' habitat. 91 Fed. Reg. 43,300 (July 14, 2026) ("Harm Rule Rescission"). The Harm Rule Rescission revokes the Services' longstanding regulatory definitions of "harm," a term included in the ESA's definition of "take" as including "significant habitat modification or degradation [that] actually kills or injures" fish or wildlife. 50 C.F.R. §§ 17.3, 222.102 (former definitions of "harm"). The Harm Rule Rescission directly undermines the ESA's species recovery purpose, and is contrary to clear statutory mandates, United States Supreme Court and Ninth Circuit precedents, and the ESA's legislative history, and thus is not in accordance with law and exceeds the Services' statutory jurisdiction and authority. 5 U.S.C. § 706(2)(A), (C). The Services' explanation and justification for the Harm Rule Rescission also is arbitrary, capricious and an abuse of discretion. *Id*. § 706(2)(A). Further, the Harm Rule Rescission was promulgated without the required level of environmental analysis under the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347 ("NEPA"), and thus "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

---

[1] State Plaintiffs are the State of California, acting through Attorney General Rob Bonta; State of Washington, acting through Attorney General Nick Brown; Commonwealth of Massachusetts, acting through Attorney General Andrea Campbell; State of Maryland, acting through Attorney General Anthony Brown; State of Arizona, acting through Attorney General Kristin Mayes; State of Colorado, acting through Attorney General Philip Weiser; State of Connecticut, acting through Attorney General William Tong; State of Delaware, acting through Attorney General Kathleen Jennings; State of Hawaii, acting through Attorney General Anee Lopez; State of Illinois, acting through Attorney General Kwame Raoul; State of Michigan, acting through Attorney General Dana Nessel; State of Minnesota, acting through Attorney General Keith Elllison; State of New Jersey, acting through Attorney General Jennifer Davenport; State of New Mexico, acting through Attorney General Raul Torrez; State of New York, acting through Attorney General Letitia James; State of Oregon, acting through Attorney General Dan Rayfield; State of Rhode Island, acting through Attorney General Peter Neronha; State of Vermont, acting through Attorney General Charity Clark; Commonwealth of Virginia, acting through Attorney General Jay Jones; State of Wisconsin, acting through Attorney General Joshua Kaul; District of Columbia, acting through Attorney General Brian Schwalb.

///

2. Congress enacted the ESA nearly fifty-five years ago in a bipartisan effort "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) ("*TVA v. Hill*"); *see* 16 U.S.C. § 1531(a). The ESA accordingly enshrines a national policy of "institutionalized caution" in recognition of the "overriding need to *devote whatever effort and resources [are] necessary* to avoid further diminution of national and worldwide wildlife resources." *TVA v. Hill*, 437 U.S. at 177, 194 (cleaned up). The ESA constitutes "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180. The fundamental purposes of the ESA are "to provide a means whereby *the ecosystems* upon which endangered . . . and threatened species *depend* may be conserved, [and] to provide a program for [their] conservation." 16 U.S.C. § 1531(b) (emphasis added). The ESA defines "conserve" broadly as "the use of all methods and procedures which are necessary to bring any endangered . . . or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," i.e., to the point of full recovery. *Id.* § 1532(3). This conservation purpose "is reflected not only in the stated policies of the Act, but in literally every section of the statute." *TVA v. Hill*, 437 U.S. at 184.

3. ESA Section 9 makes it unlawful for any person to "take" a fish or wildlife species listed as endangered under the ESA and authorizes the Services to extend this prohibition by regulation to threatened fish and wildlife species. 16 U.S.C. §§ 1538(a)(1)(B), (G). The statute defines "take" broadly as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

4. For decades prior to the Harm Rule Rescission, the Services' regulations expressly recognized that "harm" to listed fish and wildlife species can occur by way of modification or degradation of the habitat upon which these species depend for their survival and recovery. 50 C.F.R. §§ 17.3, 222.102. FWS first adopted a regulatory definition of the term "harm" in 1975, just two years after the ESA's enactment in 1973. Three years later, in 1978, the United States Supreme Court cited FWS's regulatory definition of "harm" with approval (*TVA v. Hill*, 437 U.S. at 185 n.30), and then explicitly upheld this definition in 1995 in *Babbitt v. Sweet Home Chapter*

*of Cmtys. for a Great Or.*, 515 U.S. 687, 697–708 (1995) ("*Sweet Home*"). NMFS adopted a similar regulatory definition of "harm" in 1999.

5. These regulations have long protected endangered and threatened species from human-caused harm, which is expressly prohibited by Section 9 of the ESA, by protecting the habitat upon which they depend for their survival and recovery, as contemplated by Congress in enacting the ESA. Indeed, "Congress started from the finding that '[t]he two major causes of extinction are hunting and destruction of natural habitat,'" and that "[o]f these twin threats . . . the greatest was destruction of natural habitats." *TVA v. Hill*, 437 U.S. at 179 (quoting S. Rep. No. 93-307, p. 2 (1973); *see also Palila v. Hawai'i Dep't of Land and Nat. Resources*, 639 F.2d 495, 498 (9th Cir. 1981). It is a basic biological fact that imperiled species cannot survive, let alone recover, without habitat. Congress clearly recognized that habitat loss is the primary driver of species' extinction by declaring that "various species . . . have been rendered extinct as a consequence of economic growth and development," and that accordingly, the ESA's overarching purpose is to conserve *ecosystems* in order to achieve full recovery of endangered and threatened species. 16 U.S.C. § 1531(a)(1), (b); *see also TVA. v. Hill*, 437 U.S. at 178–80; *Sweet Home*, 515 U.S. at 698–99. In 1982, Congress enacted an "incidental take" permit process, which necessarily recognizes that "take" can include destruction of listed species' habitat, and that "take" need not be direct or intentional to be prohibited under Section 9. 16 U.S.C. § 1539(a)(2). Specifically, this statutory provision authorizes the Services to permit some degree of "take" that is indirect, unintentional, and/or non-purposeful and "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." *Id*. § 1539(a)(1)(B).

6. Since its passage, the ESA has served as our nation's most effective species conservation tool. Ninety-nine percent of species protected by the ESA have avoided extinction. Multiple species at the brink of extinction, upon and following the ESA's enactment, have seen dramatic population increases. Implementation of the ESA led to the successful recovery and delisting of many species, including our national symbol, the bald eagle (*Haliaeetus leucocephalus*). These ESA success stories are due in significant part to the statute's protection of species' habitat. For decades, the Services' regulatory definitions of harm have played a critical

role in helping achieve the ESA's overarching species recovery goal, by requiring the impacts of human activities on the habitats of our nation's most vulnerable species to be avoided, minimized, and mitigated.

7. In an abrupt and wholly unsupportable reversal of the Services' decades-long view of the ESA, however, the Services now affirmatively declare that "the best interpretation of the ESA . . . does not permit agencies to factor in habitat modification or degradation in the context of Section 9 prohibited take." 91 Fed. Reg. at 43,310. The Services also decline to promulgate any replacement definition of "harm." Instead, based solely on the three dissenting justices' view in *Sweet Home*, the Services now assert that the ESA's definition of "take" is limited to an "affirmative act[] . . . directed immediately and intentionally against a particular animal—not [an] act[] or omission[] that indirectly and accidentally cause[s] injury to a population of animals." 91 Fed. Reg at 43,301 (quoting *Sweet Home*, 515 U.S. at 719–20 (dissenting opinion of Justices Scalia, Rehnquist, and Thomas)).

8. This is a reversal of staggering proportions. The Services' unreasonably narrow interpretation of the ESA's definition of "take" flies in the face of the plain language, purposes, structure, and legislative history of the ESA and decades of Supreme Court and Ninth Circuit case law interpreting that statute. *See, e.g.*, *Sweet Home*, 515 U.S. at 697–708. The Services' new interpretation of "take" also is untethered from basic biological facts. As just one example of these statutory inconsistencies, the Services' new interpretation of the term "harm" cannot be squared with Congress' enactment of the "incidental take" permit process in ESA Section 10(a)(1)(B) in 1982. Moreover, rescinding the harm definitions will have significant ramifications across multiple federal and state programs, imperiling the protection and recovery of endangered and threatened species nationwide.

9. The Harm Rule Rescission violates the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"), ESA, and NEPA in multiple ways. The Harm Rule Rescission is contrary to law and an abuse of discretion because it violates the plain language, purposes, structure and legislative history of the ESA, and numerous judicial precedents interpreting the ESA. The Harm Rule Rescission also is arbitrary, capricious, and an abuse of discretion because the Services have

failed to adequately explain and justify this dramatic change in their longstanding agency regulations. Finally, the Services failed to consider and disclose the significant environmental impacts of the Harm Rule Rescission by the preparing an environmental impact statement ("EIS"), or at the very least, an environmental assessment ("EA") under NEPA.

10. Accordingly, State Plaintiffs seek a declaration that the Services' issuance of the Harm Rule Rescission violates the APA, ESA, and NEPA, and request that the Court vacate and set aside the Harm Rule Rescission.

**JURISDICTION AND VENUE**

11. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States) ~~and 28 U.S.C. § 1346 (civil action against the United States)~~. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706. The United States has waived sovereign immunity under 5 U.S.C. § 702.

12. The Harm Rule Rescission constitutes a final agency action under the APA. 5 U.S.C. §§ 704, 706. Many of the State Plaintiffs submitted timely and detailed comments opposing the Services' Harm Rule Rescission and have therefore exhausted all administrative remedies regarding this action. All State Plaintiffs will suffer legal wrong due to the Services' actions and are adversely affected or aggrieved by the Services' actions within the meaning of the United States Constitution and the APA. 5 U.S.C. § 702.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because this is a judicial district in which Plaintiff State of California resides and in which the California Office of the Attorney General maintains its Oakland and San Francisco offices. Venue also is proper in this Court because this action seeks relief against federal agencies and officials acting in their official capacities.

**INTRADISTRICT ASSIGNMENT**

14. Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of this action to any particular location or division of this Court. This case is, however, related to

*Environmental Protection Information Center et al. v. National Marine Fisheries Service et al.*, Case No. 3:26-cv-07176 (filed July 14, 2026) and *Defenders of Wildlife v. U.S. Fish and Wildlife Service et al.*, Case No. 3:26-cv-07507 (filed July 20, 2026), both of which challenge the Harm Rule Rescission and have been assigned to the Honorable Vince G. Chhabria. Pursuant to Civil Local Rule 3-12(b), State Plaintiffs intend to promptly file an Administrative Motion to Consider Whether Cases Should Be Related to these earlier-filed actions.

**PARTIES**

15. Plaintiff STATE OF CALIFORNIA brings this action by and through Attorney General Rob Bonta. The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect public rights and interests, including actions to protect the natural resources of the State. Cal. Const. art. V, § 13; Cal. Gov't Code §§ 12600–12612. This challenge is brought in part pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the People of the State of California's interests in protecting the environment and natural resources of the State of California from pollution, impairment, or destruction. Cal. Const. art. V, § 13; Cal. Gov't Code §§ 12511, 12600–12612; *D'Amico v. Bd. of Med. Exam'rs*, 11 Cal. 3d 1 (1974).

16. The State of California has a sovereign interest in its natural resources and holds the State's fish and wildlife and water resources as state property in trust for the benefit of the People of the State. *People v. Truckee Lumber Co.*, 116 Cal. 397 (1897); *Nat'l Audubon Soc'y v. Superior Ct.*, 33 Cal. 3d 419 (1983); *Betchart v. Cal. Dep't of Fish & Game*, 158 Cal. App. 3d 1104 (1984); Cal. Water Code § 102; Cal. Fish & Game Code §§ 711.7(a), 1802. In addition, the State of California has enacted numerous laws concerning the conservation, protection, restoration, and enhancement of the fish and wildlife resources of the State, including endangered and threatened species and their habitat. Such laws include, but are not limited to, the California Endangered Species Act, Cal. Fish & Game Code §§ 2050–2089.25, which declares that the conservation, protection and enhancement of endangered and threatened species and their habitat is a matter of statewide concern, and that it is the policy of the state to conserve, protect, restore, and enhance endangered and threatened species and their habitat. Cal. Fish & Game Code §§

2050, 2051(c), 2052. As such, the State of California has both a sovereign and statutorily mandated interest in protecting species in the State from harm both within and outside of the State.

17. There are currently 142 fish and wildlife species listed as endangered or threatened under the ESA that reside wholly or partially within the State of California and its waters—more than any other mainland State. Examples include the southern sea otter (*Enhydra lutris nereis*) found along California's central coastline; the desert tortoise (*Gopherus agassizii*) and its critical habitat in the Mojave Desert; the marbled murrelet (*Brachyramphus marmoratus*) in north coast redwood forests; and three different runs of Chinook salmon (*Oncorhynchus tshawytscha*) and six different runs of steelhead salmon (*Oncorhynchus mykiss irideus*), and their spawning, rearing, and migration habitat in rivers and streams throughout California.

18. Plaintiff STATE OF WASHINGTON is a sovereign entity and brings this action to protect its own sovereign and proprietary rights. The Attorney General is the chief legal adviser to the State of Washington. The Attorney General's powers and duties include acting in federal court on matters of public concern. This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to bring suit and obtain relief on behalf of the State of Washington.

19. Wildlife, fish, and shellfish are the property of the State of Washington. Rev. Code Wash. (RCW) § 77.04.012. The Washington Department of Fish and Wildlife actively carries forth the legislative mandate to, inter alia, preserve, protect, perpetuate, and manage wildlife, fish, and wildlife and fish habitat. *Id* & § 77.04.055; *see also id*. § 77.110.030 (declaring that "conservation, enhancement, and proper utilization of the state's natural resources . . . are responsibilities of the state of Washington").

20. The Washington Fish and Wildlife Commission classifies forty-eight species or sub-species as Endangered, Threatened, or Sensitive under State law. Wash. Admin. Code 220-610-010; 220-200-100. More than half of these are also federally listed as endangered or threatened under the ESA. In total, sixty-one federally listed entities occur in Washington, including ten evolutionarily significant units of Pacific salmon.

///

21. Washington expends significant resources to monitor, protect, and recover state and federally listed species. For example, the Washington Department of Fish and Wildlife expends approximately $1,000,000 annually for management and recovery of the endangered Taylor's checkerspot butterfly (*Euphydryas Editha taylori*) and Columbia Basin pygmy rabbit (*Brachylagus idahoensis*), both of which are ESA and state listed endangered species.

22. Southern Resident killer whales (*Orcinus orca*) are an icon of Washington State and are deeply tied to the State's cultural, ecological, and economic wellbeing. Southern Residents were listed as endangered by NMFS in 2005. The greatest threat to Southern Residents is the degradation and modification of their habitat in the form of pollution, reduced prey availability, and acoustic disruption from vessels leading to disrupted feeding behavior. Washington has worked together with the Federal government to address these habitat threats and prevent extinction of the species. The Harm Rule Rescission will weaken these efforts at a time when the Southern Residents cannot afford it.

23. Equally iconic in Washington State, several distinct population segments of salmon and steelhead have been listed as federally endangered beginning in the 1990s. The most frequent and impactful listing factor for salmon and steelhead was, and still is, habitat loss and degradation. Widespread habitat degradation from historic land use practices has resulted in an "actual injury" and even death to salmon by impairing or eliminating their ability to breed, feed, and shelter. Without habitat protection and restoration, salmon populations would become more imperiled, leading to threatened populations becoming endangered and endangered populations becoming extirpated. Harm to salmon habitat limits salmon survival and hinders Southern Resident recovery efforts. Without the ability to consider habitat degradation and modification as "harm" to ESA-listed species, the Services will lack the authority to address some of the most pressing limiting factors to salmon survival.

24. Plaintiff COMMONWEALTH OF MASSACHUSETTS brings this action by and through Attorney General Andrea Campbell. The Attorney General is the chief legal officer of the Commonwealth and brings this action on behalf of itself and its residents to protect the

Commonwealth's sovereign and proprietary interest in the conservation and protection of its natural resources and the environment. *See* Mass. Const. Amend. Art. 97; Mass. Gen. Laws, ch. 12, §§ 3 and 11D.

25. At least twenty-five federally listed endangered or threatened species are known to occur in Massachusetts, including, for example, the threatened piping plover (*Charadrius melodus*) and northern long-eared bat (*Myotis septentrionalis*), and the endangered shortnose sturgeon (*Acipenser brevirostrum*) and leatherback sea turtle (*Dermochelys coriacea*). Massachusetts also has enacted and devotes significant resources to implementing numerous laws concerning the conservation, protection, restoration, and enhancement of the Commonwealth's plant, fish, and wildlife resources, such as the Massachusetts Endangered Species Act, which protects over 400 imperiled species, including those listed as endangered, threatened, and special concern species and their habitat. *See* Mass. Gen. Laws, ch. 131A. As such, the Commonwealth has an interest in protecting species in the Commonwealth from harm both within and outside of Massachusetts.

26. Plaintiff STATE OF MARYLAND is a sovereign state in the United States of America. Maryland is represented by Attorney General, Anthony G. Brown, who is the chief law enforcement officer of the State. The Attorney General has the authority to file suit to challenge action by the federal government in order to protect the natural resources and environment of the State. Md. Const. art. V, § 3(a)(2); Md. Code Ann., State Gov't § 6-106.

27. The State of Maryland has enacted laws to protect sensitive species and their habitat and explicitly incorporates federally listed species into state regulations governing imperiled species. Nongame and Endangered Species Act, MD Code. Nat. Res. §§ 10-2A et seq. Twenty-eight federally listed species, including twenty-one animals and seven plants, are believed to occur in Maryland. A few examples include the federally endangered dwarf wedgemussel (*Prolasmidonta heterodon*), an endangered distinct population segment of the Atlantic sturgeon (*Acipenser oxyrinchus*) the federally threatened bog turtle (*Glyptemys muhlenbergii*), and the federally threatened Puritan tiger beetle (*Ellisoptera puritana*). Many of these species occur not just in Maryland but in other states as well. Maryland therefore has a distinct interest in the

recovery of these species not just within its own borders but throughout each species' range.

28. Plaintiff STATE OF ARIZONA brings this action by and through Attorney General Kris Mayes. The Attorney General is the chief legal officer of the State of Arizona and authorized to act in federal court on behalf of the State. A.R.S. § 41-193. As the owner of all wildlife within the State, the State of Arizona has an interest in protecting threatened and endangered species for the benefit of the State and its people. A.R.S. § 17-102. The federal Endangered Species Act and the plants and animals it protects are incorporated into Arizona law. A.R.S. § 17-495. The State of Arizona has enacted laws, and delegates resources to protect and preserve endangered species and their habitats. This directive is executed through the Arizona State Wildlife Action Plan and the Arizona Department of Game and Fish. A.R.S. §§ 17-268-17-299, 17-314, 17-401-17-495.01.

29. Seventy-five federally listed endangered species are found either wholly or partially within the State of Arizona, including twenty-six plants and forty-nine animals. Several federally endangered large mammals, including the jaguar (*Pantherea onca*), the ocelot (*Leopardus pardalis*), and the Mexican wolf (*Canis lupus baileyi*), can be found in Arizona. Many threatened or endangered birds, fish, amphibians, and reptiles are primarily found within Arizona such as the Southwestern willow flycatcher (*Empidonax traillii extimus*), the humpback chub (*Gila intermedia*), and the Sonoran tiger salamander (*Ambystoma mavortium stebbinsi*). The State has a distinct interest in preserving Arizona's unique desert ecosystem and the threatened and endangered species living within it.

30. Plaintiff STATE OF COLORADO brings this action by and through Attorney General Phil Weiser, who is the chief legal representative of Colorado. C.R.S. § 24-31-101(1)(a). Colorado has a distinct interest in protecting and enhancing its wildlife. *See* C.R.S. § 33-1-101(1) ("It is the policy of the state of Colorado that the wildlife and their environment are to be protected, preserved, enhanced, and managed for the use, benefit, and enjoyment of the people of this state and its visitors."); C.R.S. § 33-1-101(2) ("All wildlife within this state not lawfully acquired and held by private ownership is declared to be the property of this state."). That interest extends to protecting endangered and threatened species and biodiversity in general. *See* C.R.S. § 33-2-102(1)(b) ("Species or subspecies of wildlife indigenous to this state that may be found to be

endangered or threatened within the state should be accorded protection in order to maintain and enhance their numbers to the extent possible[.]"); C.R.S. § 33-2-102(2)(b) ("It is the policy of this state to . . . [p]rotect and enhance biodiversity and resilient ecosystems in the face of population growth, development, and climate change[.]"). Colorado's interest extends even beyond its borders, to help protect endangered and threatened species elsewhere. *See* C.R.S. § 33-2-102(1)(c) ("This state should assist in the protection of species or subspecies of wildlife that are deemed to be endangered or threatened elsewhere[.]").

31. More than forty species that occur in Colorado are either listed or being reviewed for listing under the ESA. The State goes to great lengths to conserve these species and the habitats they depend on. For example, Colorado recently partnered with the U.S. Fish and Wildlife Service to develop a Conservation Benefit Agreement for the threatened greenback cutthroat trout (*Oncorhynchus clarkii stomias*), administers a Candidate Conservation Agreement with Assurances for the threatened Gunnison sage-grouse (*Centrocercus minimus*), and participates in recovery programs for several ESA-listed fish in the Upper Colorado and San Juan River Basins. The State also leases land to a conservation bank for the threatened Preble's meadow jumping mouse (*Zapus hudsonius preblei*), which has the dual benefit of conserving the species and earning money Colorado uses to fund public schools. The Harm Rule Rescission threatens these and other state investments in listed species conservation.

32. Plaintiff STATE OF CONNECTICUT brings this action by and through Attorney General William Tong. Attorney General Tong is the constitutional officer of the State that has general authority to supervise all legal matters to which the State is a party and has the authority to file civil actions in order to protect public rights and interests, including but not limited to actions to protect the protected natural resources of the State. Conn. Gen. Stat. §§ 3-125; 22a-15. This challenge is brought in part pursuant to the State's independent statutory authority to represent the people's interests in protecting the environment and natural resources of the State of Connecticut from unreasonable pollution, impairment, or destruction. Conn. Gen. Stat. §§ 22a-5; 22a-16; *Polymer Resources v. Keeney*, 227 Conn. 545, 559 and n.22 (1993).

33. The State of Connecticut has a sovereign interest in its natural resources and holds the

State's fish and wildlife and water resources in trust for the people of the State for their benefit. *State v. Ball*, 260 Conn. 275, 292 (2002); Conn. Gen. Stat. §§ 22a-5; 22a-15; 26-3. In addition, the State of Connecticut has enacted numerous laws concerning the conservation, protection, restoration and enhancement of the fish and wildlife resources of the State, including endangered and threatened species, and their habitat. Such laws include, but are not limited to, the Connecticut Endangered Species Act, which declares that the conservation, protection, restoration, and enhancement of endangered and threatened species and their habitat is a matter of statewide concern, and that it is the policy of the State to conserve, protect, restore, and enhance endangered and threatened species and their habitat. Conn. Gen. Stat. § 26-303 *et seq*. As such, the State of Connecticut has a sovereign and statutorily mandated interest in protecting species in the State from harm both within and outside of the State.

34. There are currently twenty-six fish, plant and wildlife species listed as endangered or threatened under the ESA that reside wholly or partially within the State of Connecticut and its waters. Examples include the piping plover (*Charadrius melodus*), the roseate tern (*Sterna dougallii dougallii*), the dwarf wedgemussel (*Alasmidonta heterodon*), the northern long-eared bat (*Myotis septentrionalis*), the bog turtle (*Glyptemys muhlenbergii*), and the hawksbill sea turtle (*Eretmochelys imbricata*). Connecticut is also home to several other species undergoing federal status assessment for listing and which are currently listed under the Connecticut Endangered Species Act. Some examples include the wood turtle (*Glyptemys insculpta)*, the diamondback terrapin (*Malaclemys terrapin*), the saltmarsh sparrow (*Ammospiza caudacuta*), and the tricolored bat (*Perimyotis subflavus*). Critical habitats for these species and others exist throughout Connecticut and its waters.

35. Plaintiff STATE OF DELAWARE is a sovereign State of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

36. The Delaware Department of Natural Resources and Environmental Control must

protect, manage and conserve all forms of protected wildlife within Delaware, and enforce by proper actions and proceedings the law relating thereto. 7 Del.C. §102(a). The Division of Fish and Wildlife is charged with designating those species of fish and wildlife found to be seriously threatened with extinction. 7 Del.C. §601. Such a list shall in any event include, but not be limited to, endangered species as so designated by the Secretary of the Interior. *See* 7 Del.Admin.Code Part 3900 §16.0.

37. As formally approved by the U.S. Fish and Wildlife Service, Delaware's 2025 Wildlife Action Plan provides the State's conservation blueprint for wildlife diversity through 2035, including prioritizing the protection of endangered species, designating those and others as Delaware's species of greatest conservation need. The Delaware Department of Natural Resources and Environmental Control's conservation partners worked with wildlife experts, scientists, other key stakeholders and the public throughout the State and region gathering input to develop and revise the plan to protect wildlife diversity now and prepare to adapt to future dynamic wildlife populations, habitats, threats, and actions.

38. There are twenty six different animals found in Delaware that are considered federally endangered under the ESA, including eight species that are infrequent visitors. There are also several federally endangered plants that grow in Delaware, like the swamp pink (*Helonias bullata*). However, Delaware's Wildlife Action Plan lists many more species. Delaware's species of greatest conservation need include three carnivorous mammals (such as the bobcat, or *Lynx rufus*), four small mammals (including the Delmarva fox squirrel or *Sciurus niger cinereus*), five cave bats, four tree bats, seven marine mammals (including the federally endangered North Atlantic right whale or *Eubalaena glacialis*), and twenty endangered breeding birds (such as the federally endangered red knot or *Calidris canutus*). Delaware's state designated endangered species include ten mammals, eight reptiles (such as the federally listed loggerhead sea turtle or Caretta caretta), four amphibians (such as the barking treefrog or *Hyla gratiosa*), seven fish (such as the federally listed Atlantic sturgeon or *Acipenser oxyrhynchus*), seven mollusks (such as the tidewater mucket or *Leptodea ochracea*), and thirty-one insects (such as the Bethany Beach firefly or *Photuris bethaniensis*).

///

39. Plaintiff STATE OF HAWAI‘I, represented by and through its Attorney General Anne E. Lopez, is a sovereign state of the United States of America. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

40. The State of Hawai‘i has a sovereign interest in its natural resources and holds all of the State's public natural resources in trust for the benefit of the people of the State of Hawai‘i. Haw. Const. art. XI, § 1. The State of Hawai‘i has enacted laws concerning the conservation, protection, restoration, and enhancement of the fish and wildlife resources of Hawai‘i, including threatened and endangered species and their habitat. Such laws include the Hawai‘i endangered species laws, which state that since the settlement of the Hawaiian islands, "many species of aquatic life, wildlife, and land plants that occurred naturally only in Hawaii have become extinct and many are threatened with extinction, primarily because of increased human use of the land and disturbance to native ecosystems," and that the State of Hawai‘i's policy is to "take positive actions to enhance their prospects for survival." Haw. Rev. Stat. § 195D-1. The Hawai‘i Constitution directs that the State of Hawai‘i "shall conserve and protect Hawaii's natural beauty and all natural resources," including but not limited to the "marine, seabed, and other resources located within the boundaries of the State, including the archipelagic waters of the State." Haw. Const. art. XI, §§ 1, 6. As such, the State of Hawai‘i has an interest in protecting species in the State from harm.

41. There are currently about 500 wildlife and plant species listed as endangered or threatened under the ESA that reside wholly or partially within the State of Hawai‘i and its waters. Examples include the Hawaiian monk seal (*Neomonachus schauninslandi*), the Insular False Killer Whale Distinct Population Segment (*Pseudorca crassidens*), honeycreeper birds (*e.g., Drepanis coccinea*, *Oreomystis bairdi*), sea turtles (*Chelonia mydas, Eretmochelys imbricata, Lepidochelys olivacea*), and coral (*Acropora globiceps, A. retusa, A. speciosa, Fimbriaphyllia paradivisia, Isopora crateriformis*). Hawai‘i, including the northwestern Hawaiian islands, contains hundreds of thousands of acres that are essential for the conservation

and recovery of endangered and threatened species existing nowhere else in the world.

42. Plaintiff STATE OF ILLINOIS brings this action by and through Attorney General Kwame Raoul. The Attorney General is the chief legal officer of the State of Illinois (Ill. Const., art V, § 15) and "has the prerogative of conducting legal affairs for the State." *Env't Prot. Agency v. Poll. Control Bd*., 372 N.E.2d 50, 51 (Ill. Sup. Ct. 1977). He has common law authority to represent the People of the State of Illinois and "an obligation to represent the interests of the People so as to ensure a healthful environment for all the citizens of the State." *People v. NL Indus*., 604 N.E.2d 349, 358 (Ill. Sup. Ct. 1992).

43. The State of Illinois has "ownership of and title to all wild birds and wild mammals" (520 ILCS 5/2.1 (2018)) and "all aquatic life" within the State (515 ILCS  5 (2018)). *See United Taxidermists Ass'n v. Ill. Dep't of Nat. Res*., 436 Fed. Appx. 692, 695 (7th Cir. 2011). Through the Illinois Department of Natural Resources, the State of Illinois protects wild birds, wild mammals, fish, aquatic life, reptiles, amphibians, and invertebrates found in Illinois pursuant to the Wildlife Code (520 ILCS 5/2.1), the Fish and Aquatic Life Code (515 ILCS 5/5-5), and the Herptiles-Herps Act (510 ILCS 68/105-80). The State of Illinois has also enacted numerous laws to protect endangered species (e.g., 520 ILCS 10 (2018)), animal habitat (e.g., 520 ILCS 20 (2018)), and the State's natural areas and caves (e.g., 525 ILCS 33 (2018), 525 ILCS 5/6 (2018)). Accordingly, the State has a substantial interest in protecting wildlife and endangered and threatened species both within and outside its borders.

44. Under the Illinois Endangered Species Protection Act, there are 175 endangered or threatened species living in Illinois. *See* 17 Ill. Adm. Code 1010. Included in the 175 endangered or threatened species in Illinois are twenty-four species also listed as federally endangered or threatened under the ESA. This includes the pallid sturgeon (*Scaphirhynchus albus*), the piping plover (*Charadrius melodus*), the rufa red knot (*Calidris canutus rufa*), the gray bat (*Myotis grisescens*), and the Indiana bat (*Myotis sodalist*). All of these species are known to migrate into, out of, or though Illinois. Illinois spends, on average, $3.5 million dollars annually from state and Federal funds for the protection of endangered and threatened species, including species that migrate into, out of, or through Illinois from or into other jurisdictions.

///

45. Plaintiff STATE OF MICHIGAN is a sovereign state in the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan. The Michigan Attorney General is authorized to "appear for the people of [the] state in any . . . court or tribunal, in any cause or matter . . . in which the people of [the] state may be a party or interested." Mich. Comp. Laws § 14.28. The People declared when they enacted Michigan's Constitution that the "conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people." Mich. Const. art. 4, § 52. Accordingly, they tasked Michigan's Legislature with "the protection of . . . [the] natural resources of the state from . . . impairment and destruction." *Id.*

46. The Legislature responded by passing the Natural Resources and Environmental Protection Act. Mich. Comp. Laws § 324.101 *et seq.* That law declares that "[a]ll animals found in this state, whether resident or migratory and whether native or introduced, are the property of the people of the state." *Id.* § 324.40105; *see also id.* § 324.48702(1) ("all fish, reptiles, amphibians, mollusks, and crustaceans found in this state are the property of the state."). Part 365 of that law, titled Endangered Species Protection, requires Michigan to "perform those acts necessary for the conservation, protection, restoration, and propagation of endangered and threatened species of fish, wildlife, and plants in cooperation with the federal government, pursuant to the Endangered Species Act of 1973, Public Law 93-205, 87 Stat. 884, and with rules promulgated by the Secretary of the Interior under that act." *Id.* § 324.36502.

47. Michigan has twenty-six plants and animals the Services have listed as threatened or endangered. These include the Eastern massasauga rattlesnake in Michigan's marsh areas (*Sistrurus catenatus*), the piping plover on the shores of the Great Lakes (*Charadrius melodus*), and the iconic Michigan monkey flower (*Mimulus michiganensis*). Recovering these and other threatened or endangered species is key to protecting the People's interest in conserving and developing Michigan's natural resources.

48. Plaintiff STATE OF MINNESOTA is a sovereign State in the United States of

America. Attorney General Keith Ellison brings this action on behalf of Minnesota to protect the interests of Minnesota and its residents. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.

49. The responsibility of the State includes use of all practicable means to "preserve important existing natural habitats of rare and endangered species of plants, wildlife, and fish, and provide for the wise use of our remaining areas of natural habitation, including necessary protective measures where appropriate." Minn Stat. §116D.02, subd. 2(10). Ownership of wild animals in Minnesota "is in the state, in its sovereign capacity for the benefit of all people of the state." Minn. Stat. § 97A.025; *see also* Minn. Stat. § 97A.501, subd. 1. In fulfillment of this wildlife trust obligation Minnesota has determined that its fish and wildlife are "to be conserved and enhanced through [the State's] planned scientific management, protection, and utilization." Minn. Stat. § 84.941. Minnesota's Endangered Species Statute provides for Minnesota to designate and protect endangered, threatened, or species of special concern. Minn. Stat. § 84.0895. No person may take, import, transport, or sell an endangered or threatened species of wild animal or plant unless authorized by Minnesota's Endangered Species Statute. Minn. Stat. § 84.0895, subd. 1. Minnesota regulates the treatment of species that it has designated as endangered and threatened. Minn. R. 6212.1800–2300. Minnesota's definitions of endangered and threatened species differ from—but overlap with—federal definitions under the federal Endangered Species Act, which also serves to identify, regulate, and protect the wildlife in the State.

50. Minnesota designates species of animals and plants as endangered, threatened, or species of special concern under Minnesota Rules, Chapter 6134. In total, eighteen federally listed endangered or threatened species are believed to occur in Minnesota. Seventeen of these species also occur in other States, including the endangered northern long-eared bat (*Myotis septentrionalis*) and winged mapleleaf mussel (*Quadrula fragosa*), and the threatened Dakota skipper (*Hesperia dacotae*). One federally endangered species, the Minnesota dwarf trout lily (*Erythronium propullans*), occurs only within Minnesota. At least two federally listed species, the Karner blue butterfly (*Plebejus samuelis)* and Poweshiek skipperling (*Oarisma Poweshiek*), are

now believed extirpated from Minnesota but still occur in neighboring States.

51. In partnership with federal agencies, Minnesota has invested in and implemented programs and permitting to assist in protecting and recovering these and other listed species. Minnesota therefore has an interest in the recovery of these species in Minnesota. In addition, many of the species defined under Minnesota or federal regulations occur in other States and the management of those species in other States affects their ongoing viability in Minnesota. Minnesota therefore has an interest in the recovery of such species throughout their range.

52. Plaintiff STATE OF NEW JERSEY is a sovereign State of the United States of America, and Attorney General Jennifer Davenport is the State's chief law enforcement officer and is authorized to bring this action on behalf of New Jersey to protect the interests of the State and its residents and citizens. New Jersey holds wildlife in trust for the benefit of all of its people. The New Jersey Legislature has declared that it is the policy of the State to manage all forms of wildlife to ensure their continued participation in the ecosystem. N.J. Stat. Ann. § 23:2A-2.

53. At least twenty-two federally listed endangered or threatened species are known to occur in New Jersey, including, for example, the threatened piping plover (*Charadrius melodus*), red knot (*Calidris canutus rufa*) and northern long-eared bat (*Myotis septentrionalis*), and the endangered Indiana bat (*Myotis sodalist*) and dwarf wedgemussel (*Alasmidonta heterodon*). In 2018, New Jersey designated the threatened bog turtle (*Clemmys muhlenbergii*) as the official state reptile. New Jersey protects, conserves, restores and enhances plants, fish, and wildlife resources within the State through direct protective legislation such as the Endangered and Non-Game Species Conservation Act ("ENSCA"), N.J. Stat. Ann. §§ 23:2A-1 to -16, and the Endangered Plant Species List Act, *id.* §§ 13:1B-15.151 to -158. New Jersey also considers federal and state-listed species through other legislation including, but not limited to, the Freshwater Wetlands Protection Act, *id*. § 13:9B-7(a)(2), and the Highlands Water Protection and Planning Act, *id*. § 13:20-34(a)(4), and regulatory provisions such as the Pinelands Comprehensive Management Plan, N.J. Admin. Code §§ 7:50-6.27 and -6.33 (adopted, in part, pursuant to 16 U.S.C. § 471i(f)(1)(A)) and the Coastal Zone Management Rules, N.J. Admin. Code § 7:7-9.36.

///

54. New Jersey also expends significant resources purchasing and maintaining key habitats relied upon by listed species, including vital foraging and nesting habitats along the State's coastal Barrier Islands and the Cape May Peninsula. For example, New Jersey invests time, resources, and funding to manage the federally listed threatened red knot (*Calidris canutus*). Twice annually, red knots migrate between South America and the Arctic. New Jersey and Delaware are critically important stops during the red knot's northern migration to feed on horseshoe crab eggs where the red knots must eat enough to continue their arduous journey to the Arctic. New Jersey has an interest in protecting species inhabiting this State from harm both inside and outside of its borders, and New Jersey depends on its federal partners and other States to equally protect the red knot when it is not in New Jersey.

55. Plaintiff STATE OF NEW MEXICO brings this action by and through Attorney General Raúl Torrez. The Attorney General of New Mexico is authorized to prosecute in any court or tribunal all actions and proceedings, civil or criminal, when, in his judgment, the interest of the State requires such action. N.M.S.A. 1978, § 8-5-2. Under the Constitution of New Mexico, "protection of the state's beautiful and healthful environment is . . . declared to be of fundamental importance to the public interest, health, safety and the general welfare." N.M. Const. art. XX, § 21. This provision "recognizes that a public trust duty exists for the protection of New Mexico's natural resources . . . for the benefit of the people of this state." *Sanders-Reed ex rel. Sanders-Reed v. Martinez*, 350 P.3d 1221, 1225 (N.M. Ct. App. 2015). The New Mexico Game and Fish Department is entrusted with the maintenance of wildlife and wildlife habitat and related consultations with federal and other agencies toward that goal, N.M.S.A. 1978, § 17-1-5.1, and oversees a program for conserving endangered plant species, *id.* § 75-6-1; *see also id*. 19.33.2-19.33.6 (rules pertaining to state endangered and threatened species).

56. FWS lists forty-five animal and eighteen plant species as threatened or endangered in New Mexico. These include the endangered, iconic Southwestern willow flycatcher (*Empidonax traillii extimus*), the endangered Rio Grande silvery minnow (*Hybognathus amarus*), the endangered jaguar (*Panthera onca*), the endangered Mexican wolf (*Canis lupus baileyi*), and the

threatened Mexican spotted owl (*Strix occidentalis lucida*). Protecting rare species and their habitats is fundamental to protecting New Mexico's wildlife and wild places. Tourism, often focused on outdoor recreational activities, is an important driver of New Mexico's economy. In 2024, tourism accounted for $8.8 billion in direct spending and created roughly 95,000 jobs. In 2024, outdoor recreation alone generated $3.6 billion in economic activity and supported approximately 31,000 jobs. Among the most visited places in the State is the Bosque del Apache National Wildlife Refuge, established in 1939 to provide a critical stopover for migrating waterfowl and recognized as one of the premier bird-watching areas in North America. New Mexico hosts eight additional national wildlife refuges, fifteen national parks, and numerous national monuments, national conservation areas, and Department of Defense lands. New Mexico's five national forests—the Carson, Cibola, Gila, Lincoln, and Santa Fe national forests—encompass 9.4 million acres, including most of the State's mountainous areas, plus isolated sections of the State's eastern prairies. Overall, approximately 24.7 million acres in New Mexico are federally owned, accounting for nearly thirty-two percent of the State's land mass.

57. Plaintiff STATE OF NEW YORK brings this action by and through Attorney General Letitia James. The Attorney General is the chief legal officer of the State of New York and brings this action on behalf of the State and its citizens and residents to protect their interests, and in furtherance of the State's sovereign and proprietary interests in the conservation and protection of the State's natural resources and the environment. The State of New York has an ownership interest in all non-privately held fish and wildlife in the State, and has exercised its police powers to enact laws for the protection of endangered and threatened species, protections long recognized to be vitally important and in the public interest. *See* N.Y. Envtl. Conserv. Law §§ 11-0105, 11-0535; *Barrett v. State*, 220 N.Y. 423 (1917). Wildlife conservation is a declared policy of the State of New York. *See* N.Y. Const. art. XIV, § 3.

58. There are dozens of federally endangered or threatened species that reside in whole or in part within the State of New York and its waters. Many of these species are highly migratory, and their recovery requires conservation efforts in New York, up and down the Atlantic Seaboard, and beyond. Examples include four species of sea turtles that can be found in New York waters—

the loggerhead (*Caretta caretta*), green (*Chelonia mydas*), leatherback (*Dermochelys coriacea*) and Kemp's Ridley (*Lepidochelys kempii*). Achieving effective recovery for each of these species requires strong ESA enforcement to protect such individuals that feed around Long Island, as well as those breeding and nesting in the southern United States.

59. Robust species protections under the ESA are very important to New York. New York hosts ten National Wildlife Refuges, home to federally protected species like the piping plover (*Charadrius melodus*), and dozens of other federal sites, which along with numerous in-State activities that require federal licensing and/or permitting and are subject to ESA Section 7 consultation requirements. Full and adequate implementation of the ESA's species-listing and habitat-designation provisions is critical for species' survival within New York and elsewhere. To date, faithful implementation of the ESA by the federal government, coordinated together with state efforts, have helped species recover from the brink of extinction. Habitat protection efforts led by NMFS and New York have greatly increased populations of the endangered shortnose sturgeon (*Acipenser brevirostrum*) and Atlantic sturgeon (*Acipenser oxyrinchus*). The northern long-eared bat (*Myotis septentrionalis*) also resides in-state and benefits from federal-state coordination. And one of the greatest endangered species success stories, the recovery and delisting of the iconic bald eagle (*Haliaeetus leucocephalus*), is due to federal and state efforts including FWS critical habitat protections under the ESA, and New York's reintroduction of this virtually extirpated species by importing young birds and hand-rearing them before release. Thus, strong ESA protections both within its state borders and throughout each species' range are fundamental to New York's interests.

60. Plaintiff STATE OF OREGON brings this suit by and through Attorney General Dan Rayfield. The Oregon Attorney General is the chief legal officer of the State of Oregon. The Attorney General's duties include acting in federal court on matters of public concern and upon request by any State officer when, in the discretion of the Attorney General, the action may be necessary or advisable to protect the interests of the State. Ore. Rev. Stat. § 180.060(1). The Oregon Department of Fish and Wildlife, established as a State agency by the Oregon Legislature pursuant to Ore. Rev. Stat. § 496.080, has requested that the Attorney General bring this suit to

protect Oregon's sovereign interest in preserving threatened and endangered species.

61. The State of Oregon has a sovereign interest in its natural resources and is the sovereign owner of the State's fish and wildlife. Under Oregon law, "[w]ildlife is the property of the State." Ore. Rev. Stat. § 498.002. The State of Oregon has enacted numerous laws and rules concerning the conservation and protection of the fish and wildlife resources of the State, including endangered and threatened species and their habitat. *See, e.g.*, Oregon Endangered Species Act, Ore. Rev. Stat. §§ 496.171–496.192, 498.026; Fish and Wildlife Habitat Mitigation Policy, Or. Admin. R. 635-415-0000 (creating goals and standards to "mitigate impacts to fish and wildlife habitat caused by land and water development actions"); and Goal 5 of Oregon's statewide land use planning goals, Or. Admin. R. 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(5) ("[l]ocal governments shall adopt programs that will protect natural resources," including wildlife habitat). The State of Oregon has an interest in protecting species in the State from harm both within and outside of the State.

62. Oregon is home to numerous fish, land animals, and plants that the Services have listed as endangered or threatened species. There are twenty-seven wildlife and seventeen plant species listed as threatened or endangered that occur in Oregon. Of most significance in this case is that the fate of many of these species is directly a result of, and tied to, Federal projects (*e.g.*, dams) or Federal land management that is subject to Section 7 consultation. For example, many of the State's iconic salmon and steelhead runs have been listed because of sharp population declines. This includes the majority of salmon and steelhead runs in the Columbia River basin where the construction of federal dams was a primary factor in their decline and where ongoing hydropower operations continue to hinder their recovery.

63. Elsewhere in the State, there are listed species—such as the marbled murrelet (*Brachyramphus marmoratus*), western snowy plover (*Anarhynchus nivosus nivosus*), bull trout (*Salvelinus confluentus*), Hutton tui chub (*Gila bicolor*), Lost River sucker (*Deltistes luxatus),* northwestern pond turtle (proposed, *Actinemys marmorata),* coastal marten (*Martes caurina*), Oregon spotted frog (*Rana pretiosa)*, and northern spotted owl (*Strix occidentalis caurina)*—that depend on the tens of millions of acres of federal public lands, including twelve national forests,

eighteen national wildlife refuges, Crater Lake National Park, and over fifteen million acres of Bureau of Land Management lands. Because of this close link to the habitats provided by federal lands and the habitats impacted by federal actions, the rescission of the definition of harm will have a significant negative effect on Oregon's ability to recover many of its species.

64. Oregon was the first State to have a fish species delisted due to recovery and has subsequently worked with the U.S. Fish and Wildlife Service to recover four total fish species under the prevailing Endangered Species Act regulations. This includes Foskett speckled dace (*Rhinichthys osculus*), Borax Lake chub (*Gila boraxobius*), Oregon chub (*Oregonichthys crameri*), and Modoc sucker (*Catostomus microps*), for which the State invested significant resources in partnership with the federal government to successfully protect the highly local habitat of these species while also avoiding and minimizing harm to these species under the prior definition of harm.

65. Plaintiff STATE OF RHODE ISLAND brings this suit by and through Attorney General Peter F. Neronha. The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect public rights and interests, including actions to protect the natural resources of the State. R.I. Const. art. I, § 17; R.I. Gen. Laws R.I. §§ 10-20-1, et seq. This challenge is brought in part pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the people's interests in protecting the environment and natural resources of the State of Rhode Island from pollution, impairment, or destruction. *Id.*; *Newport Realty, Inc. v. Lynch*, 878 A.2d 1021 (R.I. 2005).

66. The State of Rhode Island has a sovereign interest in its natural resources and is the sovereign and proprietary owner of all the State's fish and wildlife and water resources, which are State property held in trust by the State for the benefit of the people of the State. RI. Const. Art. I sec. 17. In addition, the State of Rhode Island has enacted numerous laws concerning the conservation, protection, restoration and enhancement of the fish and wildlife resources of the State, including endangered and threatened species, and their habitat. As such, the State of Rhode Island has an interest in protecting species in the State from actions both within and outside of the State.

///

67. There are currently eleven species listed as endangered or threatened under the ESA that reside wholly or partially within the State of Rhode Island and its waters. Examples include the roseate tern (*Sterna dougallii*) and piping plover (*Charadrius melodus*), found along Rhode Island's coastal beaches and islands; the sandplain gerardia (*Agalinis acuta*), which inhabits dry, sandy, poor-nutrient soils in sandplain and serpentine sites; and the American burying beetle (*Nicrophorus americanus*), which once lived in 35 states, the District of Columbia, and three Canadian provinces, but now are known to occur in only six states. Rhode Island has thousands of acres of federal public lands, numerous federal wildlife refuges, multiple federal water projects, numerous military facilities and other federal facilities and infrastructure projects that are subject to the ESA's requirements. Moreover, countless acres of non-federal lands and numerous non-federal facilities and activities in Rhode Island are subject to federal permitting and licensing requirements.

68. Plaintiff STATE OF VERMONT brings this action by and through Attorney General Charity R. Clark. The Attorney General appears for the State in civil causes and has the general supervision of matters and actions in favor of the State. 3 V.S.A. §§ 157, 159. The State brings this action in its capacity as sovereign, as trustee of the State's natural resources and owner of property, and pursuant to its *parens patriae* authority on behalf of the Vermont public, to conserve and protect Vermont's natural resources and environment. *See, e.g.,* Vt. Const. ch. II, § 67 (establishing that the fish and wildlife of the State are held in trust by the State for the benefit of the inhabitants of Vermont); *State v. Malmquist*, 114 Vt. 96, 102, 40 A.2d 534, 538 (1994) (describing public trust authority in protecting fish); *State v. Theriault*, 70 Vt. 617, 41 A. 1030, 1032 (1898) (describing public trust in wildlife).

69. At least ten federally listed endangered or threatened species are known to occur in Vermont, including, for example, the endangered shortnose sturgeon (*Acipenser brevirostrum*), the northern long-eared bat (*Myotis septentrionalis)*, and the wolf (*Canis lupus*), and the threatened Canadian lynx (*Lynx canadensis*), the wolverine (*Gulo gulo*), and the Puritan tiger beetle (*Ellipsoptera puritana)*. Vermont also has enacted and devotes significant resources to

implementing numerous laws concerning the conservation, protection, restoration, recovery, and enhancement of the State's plant, fish, and wildlife resources, including the Vermont Endangered Species Law, 10 V.S.A. §§ 5401–5410, which protects approximately 220 imperiled plant and animal species, including those listed as federally endangered or threatened. Several of these species occur not just in Vermont, but in other states. Vermont therefore has a distinct interest in the recovery of these species not just within its own borders but throughout each species' range.

70. Plaintiff COMMONWEALTH OF VIRGINIA is a sovereign State of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

71. At least eighty-one federally listed endangered or threatened species (fish, wildlife, and plants) and nine species proposed for federal listing are known to occur in the Commonwealth of Virginia. Examples include eastern black rail (*Laterallus jamaicensis jamaicensis*, federal threatened), piping plover (*Charadrius melodus*, federal threatened), red-cockaded woodpecker (*Picoides borealis*, federal threatened), northern long-eared bat (*Myotis septentrionalis*, federal endangered), and Appalachian rockshell (*Theliderma sparsa*, a highly-imperiled species of freshwater mussel designated as federal endangered). Critical habitat has been designated under the authorities of the federal Endangered Species Act for many listed aquatic species known from the Upper Tennessee River basin in southwest Virginia, the Big Sandy basin in southwest Virginia, and in other areas of the state.

72. The Commonwealth of Virginia has enacted numerous laws to protect fish and wildlife generally and federally designated and state-designated endangered and threatened species specifically. The state Endangered Species Act, Va. Code § 29.1-563 *et seq.*, and the Virginia Endangered Plant and Insect Species Act, Va. Code § 3.2-1000 *et seq.*, as well as respective derivative regulations, protect federal and state listed animals and plants. In the context of listed fish and wildlife, state regulation related to "take" of federal or state threatened and endangered species further precludes "harm" to animals where an action may include significant

habitat modifications or degradation where the action actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering. *See* 4 Va. Admin. Code § 15-20-140.

73. Under Section 6 of the federal Endangered Species Act, the Virginia Department of Wildlife Resources is a signatory to a cooperative agreement with the U.S. Fish and Wildlife Service and a Limited Cooperative Agreement with the National Oceanic and Atmospheric Administration regarding shared interest in the conservation and recovery of federally listed species. The Virginia Department of Wildlife Resources makes significant investments annually in related conservation and recovery activities, particularly within Virginia. Actions also occur across state boundaries for the regional or range-wide recovery of species with distributions that extend beyond Virginia. For example, the Commonwealth has propagated in captivity two species of federally endangered freshwater mussels—oyster mussel (*Epioblasma capsaeformis*) and Tennessee bean (*Venustaconcha trabalis*)—that have been donated to support recovery efforts of those species in waters in Alabama and Tennessee.

74. Plaintiff STATE OF WISCONSIN is a sovereign State of the United States of America and brings this action by and through its Attorney General, Joshua L. Kaul, who is the chief legal officer of the State of Wisconsin and has the authority to file civil actions to protect Wisconsin's rights and interests. *See* Wis. Stat. § 165.25(1m). The Attorney General's powers and duties include appearing for and representing the State, on the governor's request, "in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested." *Id.*

75. In filing this action, the Attorney General seeks to prevent injuries to the State and its residents relating to their substantial interests in protecting and preserving threatened and endangered animals and plants. These injuries include harms to Wisconsin's sovereign, quasi-sovereign, and proprietary interests.

76. Wisconsin holds legal title to all wild animals in the State "for the purposes of regulating their enjoyment, use, disposition, and conservation." Wis. Stat. § 29.011(1). In 1972, Wisconsin became one of the first States to enact its own state-level endangered species law. *See*

*generally id*. § 29.604. In doing so, the Wisconsin Legislature found that "the activities of both individual persons and governmental agencies are tending to destroy the few remaining whole plant–animal communities in this state," and that the preservation of those communities "is of highest importance." *Id*. § 29.604(1). The Legislature recognized "that certain wild animals and wild plants are endangered or threatened," and that those species "are entitled to preservation and protection as a matter of general state concern." *Id*. § 29.604(1). The State of Wisconsin therefore has substantial sovereign and statutory interests in protecting species in the State from harms within and from outside of the State.

77. The federal ESA has been important for species recovery efforts in Wisconsin. The State, through its Department of Natural Resources, works on numerous projects to maintain and restore its federally endangered and threatened species. Wisconsin designates 233 species of animals and plants as endangered or threatened within the state. Fifteen (15) of these species are also federally endangered or threatened. Many of these species also occur in other States, including the northern long-eared bat (*Myotis septentrionalis*) (threatened federally and endangered in Wisconsin) and the winged mapleleaf mussel (*Quadrula fragosa*) (threatened federally and endangered in Wisconsin).

78. Plaintiff DISTRICT OF COLUMBIA is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code § 1-301.81 (2001).

79. The District government, through its Department of Energy and the Environment ("DOEE"), "[s]erve[s] as the trustee for natural resources for the District." D.C. Code § 8-151.08(8) (2001). DOEE has a statutory mandate "to protect human health and the environment," D.C. Code § 8-151.02 (2001), and is authorized "to set policy, regulate activities, and implement programs and initiatives to protect, restore, and enhance natural resources and the environment,"

including "[a]dministering habitat, aquatic resources, and wildlife conservation and restoration programs." D.C. Code §§ 8-151.06(2),(2)(E) (2001). DOEE also creates, manages, and executes the District's State Wildlife Action Plan ("SWAP"). The District's SWAP provides the framework for conserving the District's wildlife and their habitats. Accordingly, the District has an interest in protecting species in the District, particularly threatened and endangered species. The Endangered Species Act is incorporated into District environmental regulations by reference. D.C. Mun. Regs. tit. 10-A, § 609.5 (2026); D.C. Mun. Regs. tit. 21, §§ 2600.6(c), 2699.1 (2026). As the District does not have a state equivalent of the ESA, federal partnership is essential to the protection of local wildlife, particularly on federal lands. Federal protections also protect species in the District from harm caused by actions in neighboring States.

80. The District is home to four federally listed endangered species: the Atlantic sturgeon (*Acipenser oxyrinchus*), the shortnose sturgeon (*Acipenser brevirostrum*), the northern long-eared bat (*Myotis septentrionalis*), and the Hay's Spring amphipod (*Stygobromus hayi*), a small freshwater crustacean. The Hay's Spring amphipod is endemic to the District and is found in 2.5 miles of the Lower Rock Creek Watershed, including in areas which are owned and managed by the U.S. National Park Service and the Smithsonian Institution. Additionally, the tricolored bat (*Perimyotis subflavus*) and monarch butterfly (*Danaus plexippus*) are proposed for listing as endangered species.

81. Defendant DOUG BURGUM is the Secretary of the United States Department of the Interior and is sued in his official capacity. Mr. Burgum has responsibility for implementing and fulfilling the duties of the United States Department of the Interior, including the administration of the ESA with regard to endangered and threatened terrestrial and freshwater plant and animal species and certain marine species, and bears responsibility, in whole or in part, for the acts complained of in this Complaint. Mr. Burgum signed the Harm Rule Rescission at issue in this Complaint.

82. Defendant KEVIN LILLY, Principal Deputy Assistant Secretary for Fish and Wildlife and Parks, in his official capacity. Mr. Lilly signed the Harm Rule Rescission on July 10, 2026.

///

83. Defendant UNITED STATES FISH AND WILDLIFE SERVICE is an agency within the United States Department of the Interior, 16 U.S.C. § 742b, to which the Secretary of the Interior has delegated authority to administer the ESA with regard to endangered and threatened terrestrial and freshwater plant and animal species and certain marine species, and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

84. Defendant BRIAN NESVIK is the Director of FWS and is responsible for implementing and enforcing the ESA with respect to terrestrial and freshwater fish, wildlife and plant species, and certain marine mammal species. Mr. Nesvik establishes FWS policies, sets priorities, issues directives, and is responsible for all FWS does or fails to do. Mr. Nesvik is sued in his official capacity.

85. Defendant HOWARD LUTNICK is the Secretary of the United States Department of Commerce and is sued in his official capacity. Mr. Lutnick has responsibility for implementing and fulfilling the duties of the United States Department of Commerce, including the administration of the ESA with regard to most endangered and threatened marine and anadromous fish species, and bears responsibility, in whole or in part, for the acts complained of in this Complaint. Mr. Lutnick signed the Harm Rule Rescission at issue in this Complaint.

86. TIMOTHY R. PETTY, Assistant Secretary of Commerce for Oceans and Atmosphere and Deputy NOAA Administrator, in his official capacity. Mr. Petty signed the Harm Rule Rescission on July 10, 2026.

87. Defendant NATIONAL MARINE FISHERIES SERVICE is an agency within the United States Department of Commerce to which the Secretary of Commerce has delegated authority to administer the ESA with regard to most endangered and threatened marine species and anadromous fish species, and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

88. Defendant EUGENIO PIÑEIRO SOLER is the Director of the National Marine Fisheries Service and is responsible for implementing and enforcing the ESA with respect to most protected marine mammal species and all anadromous fish species. He is sued in his official

capacity.

## STATUTORY BACKGROUND

### I. ENDANGERED SPECIES ACT

89. Congress enacted the ESA more than fifty years ago in a bipartisan effort "to halt and reverse the trend toward species extinction, whatever the cost." *TVA v. Hill*, 437 U.S. at 184; *San Luis Obispo Coastkeeper v. Santa Maria Valley Water Cons. Dist*., 49 F.4th 1242, 1244 (9th Cir. 2022); *see* 16 U.S.C. § 1531(a). The fundamental purposes of the ESA are to "provide a means whereby the ecosystems upon which endangered . . . and threatened species depend may be conserved, [and] to provide a program for the conservation of such [endangered and threatened] species[.]" 16 U.S.C. § 1531(b). Further, the ESA declares "the policy of Congress that all Federal departments and agencies *shall seek* to conserve endangered . . . and threatened species and shall utilize their authorities in furtherance of the purposes of [the ESA]." *Id*. § 1531(c)(1) (emphasis added); *see also* § 1536(a)(1); *San Luis Obispo Coastkeeper*, 49 F.4th at 1244 ("[t]he purpose of enacting the ESA was 'to require agencies to afford first priority to the declared national policy of saving endangered species'") (quoting *TVA v. Hill*, 437 U.S. at 185). The ESA defines "conserve" broadly as "to use and the use of all methods and procedures which are necessary to bring any endangered . . . or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary"—i.e., to the point of full recovery. *Id*. § 1532(3); *see also Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv*., 378 F.3d 1059, 1070 (9th Cir. 2004). The ESA achieves these statutory purposes through multiple vital statutory mechanisms relevant to the Harm Rule Rescission.

90. Section 4 of the ESA, 16 U.S.C. § 1533, prescribes the process for the Services to list a species as "endangered" or "threatened" within the meaning of the statute and to designate "critical habitat" for each such species. The ESA defines an endangered species as one "in danger of extinction throughout all or a significant portion of its range," while a threatened species is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* §§ 1532(6), (20). The ESA identifies habitat loss as one reason that a species may be listed as endangered or threatened. *Id*. § 1533(a)(1)(A).

///

91. With certain limited exceptions, when the Services list a species as endangered or threatened, they also must designate critical habitat for that species. 16 U.S.C. § 1533(a)(3)(A)(i), (b)(6)(C). The ESA defines critical habitat as areas within and outside the geographic area occupied by the species that are "essential for the conservation of the species." *Id.* § 1532(5)(A). Except in certain circumstances, "critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species," and thus, importantly, designated *critical* habitat is not necessarily co-extensive with *all* habitat. *Id.* § 1532(5)(C).

92. Section 9, 16 U.S.C. § 1538, is a "cornerstone" of the ESA. *Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000). Among other prohibitions, Section 9 prohibits any "person" from "taking" any endangered fish or wildlife species. 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" broadly as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19); *see* S. Rep. No. 93-307 at 7 (1973) ("take" is to be interpreted broadly to include "every conceivable way in which a person can 'take' wildlife"). The ESA also defines "person" broadly as "an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the [federal, state or local government]; . . . any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States." *Id.* § 1532(13). Section 4(d) of the ESA authorizes the Services to extend by regulation the Section 9 prohibitions to any or all species listed as threatened under the ESA. *Id.* § 1533(d). Such regulations are expressly made enforceable by Section 9. *Id.* §1538(a)(1)(G).

93. In 1982, Congress affirmed its understanding that "harm" within the ESA's definition of "take" includes take by way of habitat modification as well as "harm" by indirect and unintentional means. Specifically, Congress enacted an "incidental take permit" ("ITP") process under ESA Section 10 that authorizes the Services to permit an otherwise prohibited taking of listed species by a non-federal entity, provided such take is "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). To obtain an ITP under Section 10(a), the permit applicant must prepare a conservation plan, often referred to as a

habitat conservation plan ("HCP"). *Id.* § 1539(a)(2)(A). An ITP can only be issued if the relevant Service finds, *inter alia*, that (1) "the taking will be incidental," (2) the amount of authorized taking "will not appreciably reduce the likelihood of the survival and recovery of the species in the wild," and (3) the permit applicant will (a) minimize and mitigate the impacts of such taking "to the maximum extent practicable" and (b) "ensure that adequate funding for the plan will be provided." *Id.* § 1539(a)(2)(B). The legislative history of the Section 10 ITP process reflects that Congress expressly understood Section 9 to encompass "take" by way of habitat modification. *See*, *e.g.*, *Sweet Home*, 515 U.S. at 700–01; S. Rep. No. 97-418 at 26 (1982). In fact, the impetus for the ITP process was a development project in California that "threatened incidental harm to" an endangered butterfly species via destruction of the species' habitat. *See Sweet Home*, 515 U.S. at 707–08 (citing S. Rep. No. 97-418, p. 10 (1982) and H.R. Conf. Rep. 97-835, pp. 30–32 (1982).

94. While Section 10 applies to non-federal entities, Section 7 provides the mechanism for the Services to authorize incidental take of listed species by federal agencies and their permittees and licensees. 16 U.S.C. § 1536(b)(4). The Services may issue an incidental take statement ("ITS") for a proposed federal agency action if "the taking of an endangered . . . or threatened species incidental to the agency action" is "not likely to jeopardize the continued existence of" the listed species "or result in the destruction or adverse modification of" any designated critical habitat. *Id*. § 1536(b)(4)(B), (a)(2). The ITS must specify "the impact of such incidental taking on the species" and "reasonable and prudent measures that the [Service] considers necessary or appropriate to minimize such impact," and set forth terms and conditions that must be complied with to implement those measures. *Id*. § 1536(b)(4)(i) –(iv). Any take in conjunction with an approved federal agency action that is not in compliance with an ITS is a prohibited take under Section 9. *Id*. § 1536(o)(2); *Bennett v. Spear*, 520 U.S. 154, 170 (1997).

## II. ADMINISTRATIVE PROCEDURE ACT

95. The APA, 5 U.S.C. §§ 551–706, governs the procedural requirements for federal agency decision-making, including the agency rulemaking process. Under the APA, a "reviewing court shall . . . hold unlawful and set aside" federal agency action found to be "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure required by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). An agency action is arbitrary and capricious under the APA where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").

96. Additionally, "[a]gencies are free to change their existing policies," but they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citing *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005)). While an agency need not show that a new policy is "better" than the policy or rule it replaced, the agency still must demonstrate that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Federal Commc'ns. Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). Further, an agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" when "its new policy rests upon factual findings that contradict those which underlay its prior policy," "or when its prior policy has engendered serious reliance interests that must be taken into account." *Id.* Any "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Nat'l Cable & Telecomms. Ass'n*, 545 U.S. at 981.

## III. National Environmental Policy Act

97. NEPA, 42 U.S.C. §§ 4321–4347, "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council* 490 U.S. 332, 348 (1989). The statute "ensures that the agency and the public are aware of the environmental consequences of proposed projects." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.* 605 U.S. 168, 177 (2025). "Properly applied, NEPA helps agencies to make better

decisions." *Id.*

98. To achieve these goals, NEPA requires the preparation of a detailed environmental impact statement ("EIS") for any "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). A "major federal action" is an action "subject to substantial Federal control and responsibility," with specified exclusions for actions involving certain types of federal funding. 42 U.S.C. § 4336e(10)(B). Even if a proposed action will not have a "reasonably foreseeable significant effect," or the significance of an effect is unknown, an agency is still required to prepare an environmental assessment ("EA") under NEPA, unless the agency finds that the proposed action qualifies for a categorical exclusion. *Id.* § 4336(b)(2). Only where the proposed action is a wholly "nondiscretionary action" such that the "agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action" does a federal agency not have a duty to prepare an EA or EIS. 42 U.S.C. § 4336(a)(4); *see Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 766–70 (2004) ("*Public Citizen*").

99. An EA or EIS also is not required if an action falls within "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment"—so-called categorical exclusions. 42 U.S.C. § 4336e(1). The Services have established categorical exclusions only for certain actions, including regulations "that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis." *See* 43 C.F.R. § 46.210(i); *see also* National Oceanic and Atmospheric Administration ("NOAA") Administrative Order 216-6A Companion Manual ("NOAA Manual").

100. An agency is prohibited from relying on any categorical exclusion, however, if specified "extraordinary circumstances" exist. In such circumstances, "further analysis and environmental documents must be prepared for the action." 43 C.F.R. § 46.205(c)(1). The Services' regulations and policies establish that extraordinary circumstances exist, *inter alia*, where a proposed action may significantly affect any species listed or proposed to be listed as endangered or threatened or any critical habitat designated under the ESA; would have uncertain

or potentially significant environmental effects or unique or unknown environmental risks; or would have a direct relationship to other actions that implicate potentially significant environmental effects. *Id.* § 46.215(c), (e), (g); NOAA Manual at 9.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Proposed and Final Harm Rule Rescissions

101. For over fifty years prior to the Harm Rule Rescission, FWS defined "harm" as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. FWS first defined "harm" in 1975 and subsequently amended the regulation in 1981 to emphasize that "actual death or injury of a protected animal is necessary for a violation." *Sweet Home*, 515 U.S. at 691 n.2 (citing 40 Fed. Reg. 44,412, 44,416 (Sep. 26, 1975) and 46 Fed. Reg. 54,748, 54,750 (Nov. 4, 1981)). In 1995, the United States Supreme Court upheld FWS's regulatory definition of harm as fully supported by the plain language, purposes, structure, and legislative history of the ESA. *Sweet Home*, 515 U.S. at 697–708.

102. In 1999, four years after the United States Supreme Court's decision in *Sweet Home*, NMFS adopted a very similar regulatory definition of "harm," as "an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102; *see* 64 Fed. Reg. 60,727 (Nov. 8, 1999) (adding NMFS definition of "harm" in 50 C.F.R. § 222.102).

103. On April 17, 2025, the Services published a notice in the Federal Register proposing, for the first time, to rescind the definition of "harm" in both FWS's and NMFS's ESA implementing regulations. 90 Fed. Reg. 16,102 (Apr. 17, 2025) ("Proposed Rescission"). The Services claimed, as they likewise do in the Harm Rule Rescission, that the "existing regulatory definition[s] of 'harm,' which include[] habitat modification, run[] contrary to the best meaning of the statutory term 'take,'" and that the proposed rule was necessary to "adhere to the single,

best meaning of the ESA." *Id*. at 16,102 (citing *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024) ("*Loper Bright*")).

104. On May 19, 2025, many of the undersigned State Plaintiffs submitted comments on the Proposed Rescission, urging the Services to withdraw the Proposed Rescission on the grounds that it would, if finalized, be unlawful, arbitrary, capricious, and contrary to the APA, ESA, NEPA, and State Plaintiffs' interests.

105. On July 14, 2026, the Services issued the Harm Rule Rescission. 91 Fed. Reg. 43,300 (July 14, 2026). The Harm Rule Rescission is substantively the same as the Proposed Rescission and relies on essentially the same rationale and arguments. As in the Proposed Rescission, the Services again contend that they are required by *Loper Bright*, as well as the Take Care Clause of the U.S. Constitution (art. II, section 3), to rescind the longstanding regulatory definitions of "harm," because the Services now view these definitions as not reflecting the "single, best meaning" of the statute. 91 Fed. Reg. at 43,301–03, 43,305, 43,307–08, 43,310, 43,313–14.

106. Although declining to promulgate a new regulatory definition of "harm," the Services now adopt the *Sweet Home* dissenting opinion's view of the meaning and scope of the ESA's take prohibition. *Id*. at 43,300–04, 43,306, 43,314. In the dissenting Justices' view, "take" proscribes only "affirmative" acts "directed immediately and intentionally against a particular animal." *Id*. at 43,301; *see also id*. at 43,303, 43,305–06, 43,311. The Services ignore the fact that the *Sweet Home* majority explicitly rejected this cramped view of what constitutes "take" under Section 9, which disregards the fundamental conservation purpose of the ESA, the ESA's broad definition of take, the purpose and language of the Section 10 ITP process, and Congress's intent as expressed in the ESA's legislative history, among other factors. *Sweet Home*, 515 U.S. at 697–708. Consequently, the Services' newly-adopted interpretation of the ESA's take prohibition is directly contrary to the ESA. Further, the Services' explanation and justification for the Harm Rule Rescission lacks a reasoned basis, is internally inconsistent, ignores factors that Congress intended them to consider, and is otherwise arbitrary and capricious and an abuse of discretion under the APA.

107. In their comments on the Proposed Rescission, State Plaintiffs identified the

significant financial, administrative, and regulatory burdens that would be thrust upon them due to the Harm Rule Rescission. But the Harm Rule Rescission fails to adequately account for State Plaintiffs' and other stakeholders' substantial reliance on the Services' longstanding existing regulatory definitions of harm. Instead, the Services summarily dismiss these significant reliance interests, stating simply that they "are outweighed by the constitutional interest in repealing regulations that do not reflect the best reading of the statute." 91 Fed. Reg. at 43,308. Moreover, the Services' claim that these reliance interests are nothing more than mere "policy disagreements" is undermined by their simultaneous acknowledgment of, and failure to address, the fact that the Harm Rule Rescission "will result in an increased financial and administrative burden" on States to fill in the regulatory gaps created by the rescission. *Id*. at 43,309, 43,311.

108. The Harm Rule Rescission also is a major federal action that will significantly affect the human environment under NEPA. The Services, however, provide no substantive environmental analysis of the Harm Rule Rescission. Instead, the Services erroneously contend that the Harm Rule Rescission is exempt from NEPA review under the exemption for non-discretionary agency actions in 42 U.S.C. § 4336(a)(4). 91 Fed. Reg. at 43,307, 43,316. In the alternative, the Services also incorrectly assert that the Harm Rule Rescission is categorically excluded from NEPA review because it is "of a legal, technical, or procedural nature," citing 43 C.F.R. § 46.210(i). 91 Fed. Reg. at 43,306–08, 43,316; U.S. Fish & Wildlife Serv., Categorical Exclusion Documentation for NEPA Compliance, July 13, 2026, Doc. ID FWS-HQ-ES-2025-0034-242905, https://www.regulations.gov/document/FWS-HQ-ES-2025-0034-242905.

## II. IMPACTS OF THE HARM RULE RESCISSION ON STATE PLAINTIFFS

109. State Plaintiffs will be harmed by the Harm Rule Rescission in multiple ways.

110. First, State Plaintiffs have a concrete interest in preventing harm to their natural resources, both in general and under the ESA in particular. Indeed, in most of the Plaintiff States, fish and wildlife resources are owned and held by that State in both a proprietary and regulatory capacity in trust for the benefit of the entire people of that State. State Plaintiffs also hold a quasi-sovereign interest in their environment and natural resources. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982); *Maryland v. Louisiana*, 451 U.S. 725, 737–38 (1981).

Weakened protections for ESA-listed species injure State Plaintiffs in their proprietary capacity both as landowners and as regulatory trustees of their fish and wildlife resources. State Plaintiffs thus have an important interest in preventing and remedying harm to endangered and threatened species and their habitat within and across State Plaintiffs' borders. The Harm Rule Rescission's weakening of the Section 9 take prohibition—a cornerstone of the ESA—will significantly and adversely affect State Plaintiffs' fish and wildlife resources and curtail State Plaintiffs' ability to help prevent federally listed species—some of which are also listed under state laws—from sliding further toward extinction, and to prevent future federal listings. Protection of listed species' habitat is even more critical given the mounting pressures of climate change, which makes species even more vulnerable to the dangers of habitat loss.

111. Second, and relatedly, the ESA expressly declares that endangered and threatened "species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). Reducing our wealth of wild species damages each of these values and "diminish[es] a natural resource that could otherwise be used for present and future commercial purposes." *National Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041, 1053 (D.C. Cir. 1997); *see also San Luis & Delta–Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1176–77 (9th Cir. 2011). The harm that results from the loss of biological diversity is quite literally "incalculable," due to the "*unknown* uses that endangered species might have and . . . the *unforeseeable* place such creatures may have in the chain of life on this planet." *TVA v. Hill*, 437 U.S. at 177–79 (emphases in original); *see also id.* at 187.

112. Third, State Plaintiffs have institutional, proprietary, and regulatory interests in the Services' full compliance with the ESA's plain language and overriding conservation mandate. The Harm Rule Rescission weakens critical protections for listed species and increases the burden on States to fill the significant regulatory and enforcement gaps created by the Services' abdication of their duty to protect the nation's irreplaceable biological resources. Many State Plaintiffs have laws and regulations that protect species within their borders. Many State Plaintiffs also own lands, and have programs to acquire and protect properties that are home to

endangered and threatened species. In such circumstances, the Services and State Plaintiffs take account of their respective efforts to conserve rare species and often work cooperatively to share the responsibility and workload required for their protection. *See* 16 U.S.C. § 1535(c). Following the Harm Rule Rescission, State Plaintiffs will now bear a significantly greater proportion of the responsibility for protecting listed species and their habitat under existing state laws and programs, including, but not limited to, state listings, habitat protection programs, take permits and enforcement actions.

113. Fourth, and relatedly, the Harm Rule Rescission will erode the longstanding cooperative federalism relationship between the Services and the States as mandated by the ESA. The ESA specifically directs the Services to "cooperate to the maximum extent practicable with the States" in implementing the ESA, and gives State Plaintiffs a distinct role in ensuring faithful and fully informed implementation of the ESA's species conservation mandates. 16 U.S.C. § 1535(a); *see also* 16 U.S.C. § 1531(a)(5) (encouraging state species conservation); *id.* § 1533(b)(1)(A), (b)(1)(B)(ii) (accounting for state efforts to protect listed species); *id.* §§ 1533(b)(5), 1536(a)(2) (state consultation requirements for critical habitat designation); *id.* § 1533(b)(7) (requiring Services to provide specific notice to any affected state of publication of an emergency listing regulation); *id.* § 1533(g) (monitoring of recovered species in cooperation with States); *id.* § 1533(i) (heightened justification required where listing or critical habitat regulations are inconsistent with state agency's comments or petition); *id.* § 1535 (requiring Services generally to cooperate with States in implementing the ESA); *id.* § 1536(e) (each affected State must be represented on Endangered Species Committee established during consultation exemption procedure); *id.* § 1536(g) (state governors included in consultation exemption application process); *id.* § 1537a(e)(2) (States to participate in implementation of the Western Convention); *id.* § 1540(e)(1) (Services may use state agency resources to enforce the ESA). The Harm Rule Rescission will adversely affect these ongoing federal-state cooperative efforts. For example, California has worked cooperatively with FWS on seventeen joint habitat conservation plans (HCPs), approved under ESA Section 10(a)(1)(B), and state "natural community conservation plans," approved under California's Natural Community Conservation Planning Act,

Cal. Fish & Game Code §§ 2800–2835.

114. Fifth, by significantly narrowing the scope of the Section 9 take prohibition, the Harm Rule Rescission will substantially reduce, if not eliminate, incentives for non-federal entities to obtain an ITP under Section 10(a) and to mitigate the destructive impacts of their projects through HCPs, which protect listed species and the habitat upon which these species depend for survival and recovery. The Harm Rule Rescission also will eliminate many of the incentives for existing permittees to continue to implement these joint state-federal conservation plans and to comply with the terms of their federal ITPs, which will deprive the States of the benefits of those bargained-for agreements. Indeed, the preamble to the Harm Rule Rescission goes so far as to encourage existing permittees to return their permits to the Services "in order to not have to continue spending resources to mitigate." 91 Fed. Reg. at 43,305. The Harm Rule Rescission also will reduce incentives for these entities to participate in other voluntary programs that are designed to provide a net benefit for listed species, such as "conservation benefit agreements" approved under ESA Section 10(a)(1)(A).

115. In sum, for decades, State Plaintiffs have relied on the Services' longstanding harm regulations to assist them in protecting federally listed species both within and across state borders, and in cooperating with the Services to implement the ESA's important policies and programs, including, among other things, Section 10(a)(1)(B) ITPs, Section 10(a)(1)(A) conservation benefit agreements, and listed species recovery plans under Section 4(f). The Harm Rule Rescission will force State Plaintiffs to fill the resulting regulatory gaps, creating significant additional financial, administrative, and regulatory burdens for State Plaintiffs. *New Jersey v. EPA*, 989 F.3d 1038, 1046 (D.C. Cir. 2021) (noting that "exacerbated [state] administrative costs and burdens imposed by [a federal rule] . . . constitute a concrete and particularized injury").

116. As a result, the Harm Rule Rescission will cause economic, in addition to, environmental harm to State Plaintiffs because it shifts more of the responsibility for, and the financial, administrative, and regulatory burden of, protecting imperiled species and habitats within state borders to State Plaintiffs. *See California v. Azar*, 911 F.3d 558, 571–73 (9th Cir. 2018) (impact on state economic interests provides basis for standing). This will detract from

State Plaintiffs' efforts and resources to carry out their own programs and impose significantly increased financial, administrative, and regulatory burdens on State Plaintiffs. *See Air All. Hous. v. U.S. Env't Prot. Agency*, 906 F.3d 1049, 1059–60 (D.C. Cir. 2018) ("[m]onetary expenditures to mitigate and recover from harms that could have been prevented absent the [federal rule] are precisely the kind of 'pocketbook' injury that is incurred by the state itself").

117. Moreover, while State Plaintiffs can act to protect imperiled species within their own borders, they cannot do the same for such species when those species (or portions of those species' habitats) are outside their borders. Thus, despite the resource-intensive efforts described above, the State Plaintiffs may not be able to wholly fill the regulatory gaps created by the Harm Rule Rescission because other non-plaintiff States that host species with inter-state ranges may not adequately protect endangered or threatened species under their state laws.

118. The ESA's species and habitat protections, including those implemented through the Services' prior harm definition, also promote statewide and national economic benefits. For example, protection of listed species through protection of their habitats supports not only listed species, but diverse habitats that support wildlife tourism, recreation and other beneficial economic activities. Indeed, wildlife tourism generates billions of dollars annually for all States while supporting thousands of jobs. In 2022 alone, FWS reports that over 145 million people engaged in wildlife watching activities in the United States, leading to increased jobs in both the private and public sectors. Protected nature preserves also create higher residential land values. Additionally, habitat protections also can benefit hunters, fishers, and trappers because protection of imperiled species' habitats also can help to support healthy populations of non-listed game species.

119. Finally, the Services' failure to prepare an EIS, or even an EA, analyzing the significant environmental effects of the Harm Rule Rescission, and their failure to provide sufficient opportunity for public notice and comment on their conclusion that the Rule is exempt from NEPA, has harmed State Plaintiffs' procedural interests in participating in a legally-sound rulemaking and environmental review. The Services' failure to prepare an EIS or EA forecloses adequate consideration of the impacts of the Harm Rule Rescission on the State Plaintiffs' natural

resources, including listed species and their habitat. It also prevents the sufficient identification and analysis of possible mitigation measures to reduce such impacts to less-than-significant levels. *See generally Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989) ("omission of a reasonably complete discussion of possible mitigation measures [] undermine[s] the 'action-forcing' function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects") (citation omitted).

120. Consequently, State Plaintiffs have suffered, and will suffer, a legal wrong and concrete injury as a result of the Harm Rule Rescission and have standing to bring this suit. Declaring the Harm Rule Rescission contrary to law, arbitrary, capricious, an abuse of discretion, and without observance of the procedures required by law, and vacating this action, will redress the harm suffered by State Plaintiffs.

**FIRST CAUSE OF ACTION**
**(Violations of the ESA and APA, 16 U.S.C. §§ 1531–1544; 5 U.S.C. § 706(2)(A), (C))**

121. Paragraphs 1 through 120 are realleged and incorporated herein by reference.

122. Under the APA, a "reviewing court shall . . . hold unlawful and set aside" agency action found to be "an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

123. The Services' new interpretation of the ESA's take prohibition is "not in accordance with law," and exceeds their statutory jurisdiction and authority, because it is not the best reading of, and is plainly contrary to, the ESA, as well as the "ordinary understanding" of the word "harm." *See Sweet Home*, 515 U.S. at 697–98. Under their new interpretation, Section 9 only prohibits "affirmative conduct" that is "direct[ed] immediately and intentionally against a particular animal." 91 Fed. Reg. at 43,301; *see also id*. at 43,304–06, 43,311–12. The ESA's plain language, overarching conservation purpose, structure, and legislative history do not support the Service's statutory interpretation, for several reasons.

a. The Harm Rule Rescission contravenes both the ESA's broad definition of

"take" and its fundamental, overarching purpose to conserve listed species *and* "the ecosystems upon which" they "depend." 16 U.S.C. § 1531(b); *see also id*. § 1531(a)(1) (declaring that various species "have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation"). The Services' interpretation is also contrary to their clear statutory duty to utilize all of their authorities to conserve listed species and their habitat under the ESA. *Id*. §§1531(c)(1), 1536(a)(1).

b. The Services' restrictive interpretation of "take" as not applying to indirect and unintentional actions also is contrary to both the plain language of Section 10(a) and congressional understanding in enacting that section, which clearly indicate that "take" necessarily includes acts that unintentionally, indirectly, and *incidentally* affect listed species—including habitat modification. *See* 16 U.S.C. §1539(a)(1)(B) (authorizing the Services to permit take that is "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity").

c. The Services' new interpretation of "take" effectively renders the ITP process in Section 10(a), as well as the ITS provision in Section 7(b)(4), mere surplusage, flouting the "cardinal rule" of statutory construction that all parts of a statute are to be read as a whole and given effect, *Duncan v. Walker*, 533 U.S. 167, 174 (2001), and directly undercutting the Services' repeated assertion that their new interpretation reflects the "single, best meaning of the statute." *See, e.g.*, 91 Fed. Reg. at 43,301 (citing *Loper Bright*, 603 U.S. at 406). The Services now will only issue ITPs and ITSs "where there is an affirmative conduct intentionally directed against a particular animal or animals," and they flatly state that, accordingly, an ITP will no longer be required for any activities that affect listed species' habitat. 91 Fed. Reg. at 43,404–05; *see also id*. at 43,304–06, 43,311–12. If activities that only indirectly and unintentionally adversely affect listed fish or wildlife species, including habitat destruction and modification, can no longer be considered "harm," then the ITP and ITS processes are effectively meaningless.

d. The Services' interpretation of "take" also creates inconsistencies with the penalty provisions in Section 11 of the ESA, which establish specified civil and criminal penalties for persons who, *inter alia*, "knowingly" violate, and lesser penalties for persons who "otherwise"

violate, Section 9 of the ESA. 16 U.S.C. § 1540(a)(1), (b)(1). By contrast, the Services' interpretation of "take" to require an "affirmative act directed immediately and intentionally against a particular animal" (91 Fed. Reg. at 43,301) effectively raises the culpable mental state for a violation of Section 9 above that established by Congress.

e. By adopting the *Sweet Home* dissent's narrow view of the ESA's definition of "take" as the "single, best" reading or meaning of the statute, 91 Fed. Reg. at 43,301–06, 43,309, 43,312–14, the Services' rationale and interpretation also are directly contrary to the controlling United States Supreme Court's majority opinion in *Sweet Home*, 515 U.S. 687. The *Sweet Home* majority upheld the then-existing regulatory definition of "harm" after extensively analyzing the ESA's text, purpose, statutory structure, and legislative history. *Id*. at 697–708. In conducting this analysis, the Court expressly *rejected* the dissenting opinion's narrow interpretation of the scope of the ESA's take prohibition. *Id*.

f. The Services' rationale for the Harm Rule Rescission and narrow interpretation of the term "take" further runs counter to the Supreme Court's decision in *Loper Bright*, 603 U.S. 369, which speaks to *judicial* review of agency regulations, not an *agency's* review of *its own* regulations. *Cf*. 91 Fed. Reg. at 43,301–04, 43,306, 43,314 (stating that federal agencies are under a duty to determine the "single, best meaning" of their authorizing statute) and *Loper Bright*, 603 U.S. at 400–01, 403–04, 409–10 (explaining that it is fundamentally the province of the courts, not executive branch agencies, to interpret the single, best meaning of a statute). The Services flip *Loper Bright* on its head, using it as a purported basis to disregard the Supreme Court's binding precedent in *Sweet Home—the judiciary's* final word on the meaning of "harm" in the ESA—and instead adopt an interpretation of the ESA's take prohibition that the Supreme Court expressly *rejected* in that case.

124. Accordingly, in promulgating the Harm Rule Rescission, the Services acted in a manner that is contrary to law and in excess of their statutory jurisdiction, authority and limitations, and abused their discretion, in violation of the ESA and the APA. 16 U.S.C. §§ 1531–1544; 5 U.S.C. § 706. Consequently, the Services' new interpretation of the scope of the ESA's take prohibition as set forth in the Harm Rule Rescission should be held unlawful and set aside.

**SECOND CAUSE OF ACTION**
**(Violations of the APA, 5 U.S.C. §706(2)(A))**

125. Paragraphs 1 through 124 are realleged and incorporated herein by reference.

126. Under the APA, a reviewing court must hold unlawful and set aside agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). An agency regulation is arbitrary, capricious, and an abuse of discretion under the APA if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (cleaned up). Under the arbitrary and capricious standard, a reviewing court also must set aside agency action if the agency "relie[s] on factors which Congress has not intended it to consider," "entirely fail[s] to consider an important aspect of the problem," or has "offered an explanation for its decision that runs counter to the evidence before the agency" or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

127. In addition, when an agency changes course (particularly where, as here, the change represents a radical departure from longstanding agency regulations, interpretation, and practice), it must show "that the new policy is permissible under the statute [and] that there are good reasons for it." *Fox*, 556 U.S. at 515. In addition, an agency must "provide a more detailed justification" when its "prior policy has engendered serious reliance interests that must be taken into account." *Id*.

128. The Harm Rule Rescission is arbitrary, capricious, and an abuse of the Services' discretion under the APA because the Services fail to provide a reasoned analysis and do not adequately justify their sudden, dramatic departure from their decades-long interpretation of the ESA's definition of "take." The Services further relied on factors Congress did not intend for them to consider, entirely overlooked important issues at the heart of their species-protection duties under the ESA, and offered implausible explanations running counter to the evidence before the Services. The Harm Rule Rescission also runs contrary to basic principles of biological science, which dictate that listed species cannot survive, let alone recover, without habitat in which to live. Consequently, the Services' reasoning ignores that the fundamental conservation

purposes of the ESA cannot be met absent a broad reading of the term "take" in the ESA.

129. In promulgating the Harm Rule Rescission, among other APA violations, the Services:

a. Fail to provide a reasoned explanation for the rescission, instead claiming that the prior definition did not comport with the "single, best" reading or meaning of the term "take" in the ESA—a conclusion that is arbitrary, capricious, and an abuse of discretion because it is inconsistent with the text, purpose, structure and history of the ESA, and is contrary to basic principles of statutory construction and controlling case law.

b. Fail to address how the ESA's overarching species recovery goal will be met following the Harm Rule Rescission's exemption of all non-federal activities from any duty to mitigate for impacts to listed species' habitat, despite the Services' acknowledgment that habitat destruction remains "a significant threat to many species listed under the ESA." 91 Fed. Reg. 43,309; *see also id*. at 43,311–12.

c. Fail to address the Harm Rule Rescission's foreseeable effects on Section 10(a) ITPs and Section 7 ITSs, namely, (1) whether ITPs and ITSs will even be issued in the first instance; (2) if they are issued, what effects the Harm Rule Rescission will have on the number, type, and extent of reasonable and prudent measures that will be included in Section 7(b)(4) ITSs, and the number, type, and extent of mitigation measures that will be included in Section 10(a) ITPs; and (3) whether existing ITPs and ITSs based on habitat modification will continue in effect.

d. Arbitrarily and capriciously rely on the Section 5 land acquisition provisions and the protection of critical habitat via the Section 7 consultation process as the sole mechanisms for protecting habitat under the ESA, and fail to address the significant weakening of protections for critical habitat under other recently finalized and proposed ESA regulations.

e. Arbitrarily and capriciously fail to acknowledge the "actual death or injury" limitations in their prior regulatory definitions of "harm."

f. Arbitrarily and capriciously dismiss the significant third-party reliance interests predicated on the existing regulatory definitions of "harm," simply concluding—without

explanation or justification—that such reliance interests "do not outweigh the need for full rescission" due to the existing regulations' claimed unlawfulness. 91 Fed. Reg at 43,302; *see also id*. at 43,305–06, 43,308–09.

g. Arbitrarily and capriciously dismiss the significant reliance interests of State Plaintiffs as "mere policy disagreements," 91 Fed. Reg. at 43,309, without addressing in any meaningful way the significant regulatory gaps and increased financial, administrative, and regulatory burdens on the States that will be created by rescission of the longstanding harm definition and associated protections on which State Plaintiffs have relied for decades.

h. Fail to address the effect of the Harm Rule Rescission on longstanding federal-state cooperative efforts to implement the ESA's protections and programs, including, but not limited to, Section 10(a) ITPs and conservation benefit agreements, Section 7 biological opinions, Section 6 cooperative agreements, and Section 4(f) recovery plans.

i. Arbitrarily and capriciously dismiss concerns regarding the substantial regulatory confusion that will be engendered by rescinding the Services' longstanding definitions of harm, simply asserting that the Harm Rule Rescission is necessary to align their regulations with "the single, best reading of the statute." 91 Fed. Reg. at 43,305.

j. Fail to address the Harm Rule Rescission's inconsistencies with other FWS and NMFS regulations.

130. Accordingly, the Harm Rule Rescission is arbitrary, capricious, and an abuse of discretion, in violation of the APA. 5 U.S.C. § 706. Consequently, the Harm Rule Rescission should be held unlawful, and set aside.

## THIRD CAUSE OF ACTION
## (Violations of NEPA and the APA, 42 U.S.C. § 4332(2)(C); 5 U.S.C. § 706(2)(A), (D))

131. Paragraphs 1 through 130 are realleged and incorporated herein by reference.

132. NEPA requires federal agencies to take a "hard look" at the environmental consequences of a proposed activity before taking action. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (cleaned up). To achieve this purpose, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of

the human environment," 42 U.S.C. § 4332(2)(C), or an EA if the agency's action "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," *id.* § 4336(b)(2).

133. The Harm Rule Rescission is a major federal action that has reasonably foreseeable, adverse effects on the quality of the human environment through significant impacts to imperiled species and their habitats. The Harm Rule Rescission will, among other adverse impacts, weaken federal protections for listed species and their habitat by significantly narrowing the scope of Section 9 take prohibition and reduce protections for the habitat that listed species depend upon for their survival and recovery. The Services thus were required to prepare an EIS, or at the very least an EA, under NEPA.

134. The Services incorrectly assert that the Harm Rule Rescission is a nondiscretionary agency action, and thus not subject to NEPA, because the rule is allegedly "compelled by the best reading of the statutory text." 91 Fed. Reg. at 43,307. A nondiscretionary action is one where an agency "has *no ability to prevent* a certain effect due to its limited statutory authority over the relevant actions." *Pub. Citizen*, 541 U.S. at 771 (emphasis added). An agency's decision to change its long-standing interpretation of an unamended statute is an exercise of that agency's discretion. The Services here plainly have statutory authority and discretion to maintain the current definition of harm and prevent the significant environmental effects of the Harm Rule Rescission. Thus, the Services were required to prepare an environmental document under NEPA.

135. Because of the significant environmental impacts on imperiled species and their habitat due to the Harm Rule Rescission, the Rule also does not qualify for a categorical exclusion from NEPA review, as categorical exclusions are only available for actions that "normally do[] not significantly affect the quality of the human environment." 42 U.S.C. § 4336e(1). The categorical exclusion the Services cite here, applicable to policies and regulations of an administrative or procedural nature, 43 C.F.R. § 46.210(i), does not apply by its terms to the substantive, significant changes in the regulatory regime effectuated by the Harm Rule Rescission. This rule will have significant direct, indirect, and cumulative effects on listed species and their habitat. *See* 91 Fed. Reg. at 43,314–15 (Office of Information and Regulatory Affairs

determination that the Final Rule constitutes significant regulatory action pursuant to Executive Order 12866).

136. Further, the presence of extraordinary circumstances converts an action that normally does not have significant environmental effects into an action that does have such effects, rendering any reliance on a categorical exclusion unlawful. 43 C.F.R. § 46.205(c)(1). "Extraordinary circumstances" preventing application of a categorical exclusion occur where, as here, the action will have significant effects on listed species, species proposed to be listed under the ESA, and designated critical habitat for those species. *See* 43 C.F.R. § 46.215(g); NOAA Manual V.D(3).

137. For all the foregoing reasons, the Services' failure to take a "hard look" at the environmental impacts of the Harm Rule Rescission in an EIS or EA, and their determination that the Harm Rule Rescission is subject to a categorical or "non-discretionary" exclusion from NEPA, was arbitrary and capricious, an abuse of discretion, and contrary to the requirements of NEPA and the APA. 5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332(2)(C). Moreover, in promulgating the Harm Rule Rescission, the Services failed to observe the "procedure required by law" as mandated by 5 U.S.C. § 706(2)(D). Consequently, the Harm Rule Rescission should be held unlawful, and set aside.

## PRAYER FOR RELIEF

WHEREFORE, State Plaintiffs respectfully request that this Court:

1. Issue a declaratory judgment that the Services acted contrary to law and in excess of their statutory jurisdiction, authority and limitations, and abused their discretion in adopting the new interpretation of the term "take" in the Harm Rule Rescission, in violation of the ESA and the APA;

2. Issue a declaratory judgment that the Services acted arbitrarily, capriciously and abused their discretion in promulgating the Harm Rule Rescission, in violation of the APA;

3. Issue a declaratory judgment that the Services acted arbitrarily, capriciously, contrary to law, abused their discretion, and failed to follow the procedures required by law in their promulgation of the Harm Rule Rescission, in violation of NEPA and the APA;

4. Issue an order vacating the Harm Rule Rescission and thereby automatically reinstating the prior regulatory definitions of harm;

5. Award State Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 16 U.S.C. § 1540(g)(4); and

6. Award such other relief as the Court deems just and proper.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

Dated: October 6, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
LAURA J. ZUCKERMAN
Supervising Deputy Attorney General

*/s/ Tara Mueller*
TARA MUELLER (SBN 161536)
JENNIFER LODA (SBN 284889)
HEATHER M. LEWIS (SBN 291933)
SUSANA AGUILERA (SBN 341788)
Deputy Attorneys General
1515 Clay Street, 20th Floor
Oakland, CA 94612
Telephone: (510) 879-0754
Fax: (510) 622-2270
E-mail: Tara.Mueller@doj.ca.gov

*Attorneys for Plaintiff State of California*

NICK BROWN
Attorney General of Washington

*/s/ Maggie Baker Smith*
MAGGIE BAKER SMITH (*pro hac vice*)
ELIZABETH M. HARRIS (*pro hac vice*)
Assistant Attorneys General
Washington Attorney General's Office
Environmental Protection Division
800 5th Ave., Suite 2000, TB-14
Seattle, WA 98104-3188
Telephone: (360) 582-6569
E-mail: Maggie.Smith@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

*/s/ Michele Hunton*
MICHELE HUNTON (*pro hac vice*)
ZEUS SMITH (*pro hac vice*)
Assistant Attorneys General
Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
E-mail: Michele.Hunton@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Steven J. Goldstein*
STEVEN J. GOLDSTEIN (*pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Maryland
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Telephone: 410-576-6414
E-mail: sgoldstein@oag.maryland.gov

*Attorney for Plaintiff State of Maryland*

KRISTIN K. MAYES
Attorney General of Arizona

/s/ *Anthony C. Proano*
ANTHONY C. PROANO*
Special Assistant Attorney General
Office of the Arizona Attorney General
Environmental Protection Unit
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-7753
E-mail: Anthony.Proano@azag.gov

*Attorneys for Plaintiff State of Arizona*

KATHLEEN JENNINGS
Attorney General of the State of Delaware

/s/ *Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
RALPH K. DURSTEIN III
VANESSA L. KASSAB*
Deputy Attorneys General
ROBIN L. JACOBS
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
Telephone: (302) 683-8899
E-mail: vanessa.kassab@delaware.gov

*Attorneys for Plaintiff State of Delaware*

PHILIP J. WEISER
Attorney General of Colorado

/s/ *Christopher Breidenbach*
CARRIE NOTEBOOM (*pro hac vice*)
Assistant Deputy Attorney General
CHRISTOPHER BREIDENBACH (*pro hac vice*)
Senior Assistant Attorney General
Natural Resources and Environment Section
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: 720-508-6285
E-mail: Carrie.Noteboom@coag.gov

*Attorneys for State of Colorado*

ANNE LOPEZ
Attorney General of Hawai‘i

/s/ *Danica Patel*
DANICA PATEL*
Deputy Attorney General
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1500
Fax: (808) 586-1239
E-mail: Danica.L.Patel@hawaii.gov

*Attorney for Plaintiff State of Hawai‘i*

WILLIAM TONG
Attorney General of Connecticut

/s/ *Daniel M. Salton*
DANIEL M. SALTON (*pro hac vice*)
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5250
E-mail: daniel.salton@ct.gov

*Attorney for Plaintiff State of Connecticut*

KWAME RAOUL
Attorney General of Illinois

/s/ *Joanna K. Brinkman*
JOANNA K. BRINKMAN (*pro hac vice*)
Complex Litigation Counsel
JASON E. JAMES
Assistant Attorney General
ROGER JOHNSON
Assistant Attorney General
Illinois Attorney General's Office
115 S. LaSalle St.
Chicago, IL 60603
Telephone: 312-814-3033
E-mail: joanna.brinkman@ilag.gov

*Attorneys for Plaintiff State of Illinois*

DANA NESSEL
Attorney General of Michigan

/s/ Nathan A. Gambill
NATHAN A. GAMBILL (*pro hac vice*)
Assistant Attorney General
Michigan Department of Attorney General
Environment, Natural Resources,
and Agriculture Division
P.O. Box 30755
Lansing, MI 48909
Telephone: (517) 335-7664
E-mail: gambilln@michigan.gov

*Attorney for the State of Michigan*

KEITH ELLISON
Attorney General of Minnesota

/s/ Cat Rios-Keating
CAT RIOS-KEATING (*pro hac vice*)
Special Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 300-7302
E-mail: catherine.rios-keating@ag.state.mn.us

*Attorney for Plaintiff State of Minnesota*

JENNIFER DAVENPORT
Attorney General of New Jersey

/s/ Lisa J. Morelli
LISA J. MORELLI, State Bar No. 137092
ALANA V. PACCIONE (*pro hac vice*)
Deputy Attorneys General
New Jersey Division of Law
25 Market Street
Trenton, New Jersey 08625
Telephone: (609) 376-2740
E-mail: Lisa.Morelli@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*

RAÚL TORREZ
Attorney General of New Mexico

/s/ J. Spenser Lotz
J. SPENSER LOTZ*
Assistant Attorney General
Environmental Protection Bureau
201 Third St. NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 616-7560
E-mail: slotz@nmdoj.gov

*Attorney for Plaintiff State of New Mexico*

LETITIA JAMES
Attorney General of New York

/s/ Laura Mirman-Heslin
LAURA MIRMAN-HESLIN (*pro hac vice*)
Assistant Attorney General
Office of the New York State Attorney
General
Environmental Protection Bureau
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-6091
E-mail: Laura.Mirman-Heslin@ag.ny.gov

*Attorney for Plaintiff State of New York*

DAN RAYFIELD
Attorney General of Oregon

/s/ Paul Garrahan
PAUL GARRAHAN (*pro hac vice*)
Sr. Assistant Attorney General
Oregon Department of Justice
Natural Resources Section
1162 Court Street NE
Salem, Oregon 97301-4096
Telephone: (503) 947-4540
E-mail: Paul.Garrahan@doj.oregon.gov

*Attorney for Plaintiff State of Oregon*

PETER F. NERONHA
Attorney General of Rhode Island

/s/ Nicholas M. Vaz
NICHOLAS M. VAZ (*pro hac vice*)
Assistant Attorney General
Rhode Island Office of the Attorney General
Environment and Energy Unit Chief
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400 ext. 2297
E-mail: nvaz@riag.ri.gov

*Attorney for Plaintiff State of Rhode Island*

JOSHUA L. KAUL
Attorney General of Wisconsin

/s/ Kevin Grzebielski
KEVIN L. GRZEBIELSKI (*pro hac vice*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
Telephone: (608) 266-7234
Email: Kevin.Grzebielski@wisdoj.gov

*Attorney for Plaintiff State of Wisconsin*

CHARITY R. CLARK
Attorney General of Vermont

/s/ Justin G. Sherman
JUSTIN G. SHERMAN*
Assistant Attorney General
Vermont Attorney General's Office
Environmental and Public Protection Division
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-5621
E-mail: justin.sherman@vermont.gov

*Attorney for Plaintiff State of Vermont*

BRIAN L. SCHWALB
Attorney General for the District of Columbia

/s/ Coty Montag
COTY MONTAG, State Bar No. 255703
Deputy Attorney General
LAUREN MARKS
Special Assistant Attorney General
KATHRYN BLANCO
Assistant Attorney General
400 6th Street NW Washington, D.C. 20001
Telephone: 202-256-3713
E-mail: Coty.Montag@dc.gov

*Attorneys for Plaintiff District of Columbia*

JAY JONES
Attorney General for the Commonwealth of Virginia

/s/ Megan C. Keenan
MEGAN C. KEENAN*
Deputy Solicitor General
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 997-5222
E-mail: mkeenan@oag.state.va.us

*Attorney for Plaintiff Commonwealth of Virginia*

**Application for admission pro hac vice forthcoming*